PROCESS GAS CONSUMERS
GROUP, Petitioner,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, John R. Block, Sec-
retary of Agriculture, Respondents.

Fertilizer Institute, Agrico Chemical Com-
pany, Columbia Nitrogen Corp. and Ni-
pro, Inc., American Feed Manufacturers
Association, National Council of Farmer
Cooperatives, W. R. Grace & Co., Terra
Chemicals International Inc., Farmland
Industries, Inc., Central Carolina Farm-
ers Exchange, Intervenors.

UNITED DISTRIBUTION COMPANIES,
Petitioner,

v.

UNITED STATES DEPARTMENT OF
AGRICULTURE, John R. Block, Sec-
retary of Agriculture, Respondents.

Fertilizer Institute, Agrico Chemical Com-
pany, Columbia Nitrogen Corp. and Ni-
pro, Inc., American Feed Manufacturers
Association, National Council of Farmer
Cooperatives, W. R. Grace & Co., Inter-
venors.

Nos. 80–1558, 80–1603.

United States Court of Appeals,
District of Columbia Circuit.

Argued 14 May 1981.

Decided 30 June 1981.

**460**

Edward J. Grenier, Jr., Washington, D. C., with whom Richard P. Noland, William H. Penniman and David A. Gross, Washington, D. C., were on the brief for petitioners in No. 80–1558.

C. William Cooper, Washington, D. C., with whom J. Richard Tiano, Richard M. Merriman, Lisa Holland Powell, Peyton G. Bowman, III, and John R. Schaefgen, Jr., Washington, D. C., were on the brief for petitioner in No. 80–1603.

Terrance G. Jackson, Atty., Dept. of Agriculture, Washington, D. C., with whom Daniel Marcus, Gen. Counsel, James Michael Kelly, Associate Gen. Counsel, and Raymond W. Fullerton, Asst. Gen. Counsel, Washington, D. C., were on the brief for respondents.

Kent L. Jones, Washington, D. C., with whom Bradford G. Keithley, Raymond B. Kelly, Fort Worth, Tex., and James D. Satrom, Washington, D. C., for Agrico Chemical Co.; Philip C. Olsson, Richard H. Ekfelt and Richard L. Frank, Washington, D. C., for American Feed Mfrs. Ass'n; William A. Mogel, Washington, D. C., for Farmland Industries, Inc., et al.; James S. Krzyminski and Donald Fredrick, Washington, D. C., for Nat. Council of Farmer Cooperatives; Fredrick G. Berner, Jr., Washington, D. C., for Columbia Nitrogen Corp., et al.; Stephen A. Herman and Kevin R. Jones, Washington, D. C., for Fertilizer Institute; Stanley M. Morley and Joel F. Zipp, Beachwood, Ohio, for W. R. Grace & Co.; James L. Newsom, Durham, N. C., for Central Carolina Farmers Exchange, Inc., were on the joint brief for Agricultural intervenors in No. 80–1558 and 80–1603.

Before ROBINSON, Chief Judge, THORNBERRY [*], Senior Circuit Judge for the Fifth Circuit and WILKEY, Circuit Judge.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

At issue in this case is the meaning of the term "process fuel" as it is used in section 401(f)(1)(B) of the Natural Gas Policy Act of 1978 (NGPA or the Act).[1]

## I. BACKGROUND

The Natural Gas Policy Act creates a system of priorities for the allocation during times of shortage of natural gas distributed through interstate pipelines. Whenever there is an insufficient supply, under the Act first in line to receive gas are schools, small businesses, residences, hospitals, and all others for whom a curtailment of natural gas could endanger life, health, or the maintenance of physical property.[2] After these "high-priority" users have been satisfied, next in line are those who will put the gas to "essential agricultural uses,"[3] followed by those who will use the gas for "essential industrial process or feedstock uses,"[4] followed by everybody else. We are concerned in this case with what can properly be included within the second priority category, that of "essential agricultural uses."

The NGPA provides a list of natural gas uses which are candidates for the "essential agricultural use" priority.[5] But to qualify, a candidate use must also meet two additional requirements: first, there must be no substitute fuel both "economically practica-

---

[*] Sitting by designation pursuant to 28 U.S.C. § 294(d).

[1] 15 U.S.C. § 3391(f)(1)(B) (Supp.1979).

[2] *Id.* § 3391(f)(2).

[3] *Id.* § 3391(f)(1).

[4] *Id.* § 3392.

[5] *Id.* § 3391(f)(1).

ble" and "reasonably available." [6] And second, the Secretary of Agriculture must certify the application as "necessary for full food and fiber production." [7]

Finally, uses within a disfavored subcategory of "essential agricultural uses" defined in section 401(f)(1)(B) of the Act are required to meet one more test before qualifying for the priority. Whereas most applications of natural gas can qualify for the priority without restriction as to how the gas is used, these disfavored applications of natural gas ("in the production of fertilizer, agricultural chemicals, animal feed, or food") [8] qualify for the priority only if the gas is used "as a process fuel or feedstock." [9]

To summarize, to qualify for the "essential agricultural use" priority, a use in this disfavored subcategory 401(f)(1)(B) must: (1) be without an "economically practicable" and "reasonably available" substitute; (2) be certified by the Secretary as "necessary for full food and fiber production"; and (3) be a use as a "process fuel or feedstock." The dispute in this case concerns the meaning of the term "process fuel" in this third limitation.

The petitioners are users of natural gas who are not entitled to the first priority available, for example, to schools and hospitals, or to the second priority available for "essential agricultural uses." In the event of a natural gas curtailment, these users will begin to receive natural gas only if the "high-priority" users and the "essential agricultural" users have been satisfied. They thus have an interest in ensuring that the "essential agricultural use" category is limited to the uses specified in the statute, because any expansion would come at their expense.

In the present action they challenge the interpretation the Secretary of Agriculture has given to the statutory limitation of the priority for the disfavored section 401(f)(1)(B) uses to uses as a "process fuel." Their challenge in large measure is based on a widely used definition of "process gas" promulgated by the Federal Power Commission (FPC) in 1973. That definition, which was in common use during the enactment of the Natural Gas Policy Act of 1978, was part of a division of natural gas uses into three categories as follows:

> *Process gas*: Is defined as gas use for which alternate fuels are not technically feasible such as in applications requiring precise temperature controls and precise flame characteristics. For the purposes of this definition propane and other gaseous fuels shall not be considered alternate fuels.
>
> *Boiler fuel*: Is considered to be natural gas used as a fuel for the generation of steam or electricity, including the utilization of gas turbines for the generation of electricity.
>
> *Feedstock gas*: Is defined as natural gas used as raw material for its chemical properties in creating an end product. [10]

Under the FPC definition, then, boiler fuel used to generate steam can almost never, if ever, be considered to be process gas, because "process gas" is a term restricted to uses requiring the rapid response, flame uniformity, and precise temperature control achievable only with natural gas, while in principle anything that will burn can be used to heat a boiler.

In interpreting section 401(f)(1)(B) of the Act, however, the Secretary of Agriculture, contrary to the older FPC definitions, has included within the definition of process fuel "natural gas used to produce steam which in turn is directly applied in processing of products and for compression of products so that processing may take place." [11] In other words, under the Secretary's definition, some boiler uses of natural gas *are* process fuel uses.

**6.** *Id.* § 3391(b).

**7.** *Id.* § 3391(c), (f)(1).

**8.** *Id.* § 3391(f)(1)(B).

**9.** *Id.*

**10.** 18 C.F.R. § 2.78(c) (1974).

**11.** 45 Fed.Reg. 27741, 27745 (24 April 1980) (to be codified in 7 C.F.R. § 2900.2(e)).

The petitioners contend the Secretary's definition of "process fuel" is too expansive, unlawfully augmenting the size of the "essential agricultural use" priority, and thereby endangering their natural gas supply should a natural gas curtailment occur. More fundamentally, they challenge the Secretary's authority even to promulgate a definition of "process fuel." According to the petitioners, while the Secretary is charged with the responsibility for certifying which "essential agricultural uses" are required for "full food and fiber production," it is the Federal Energy Regulatory Commission (FERC), not the Secretary of Agriculture, who is charged with the responsibility for defining the technical and trade terms used in the Act.

We are thus confronted with a question of statutory construction: under the provisions of the Natural Gas Policy Act of 1978, does the Secretary of Agriculture have the authority to define the statutory term "process fuel," and, if so, is the definition he has given the term consistent with the intent of Congress?

## II. PROCEDURAL HISTORY

After the passage of the Natural Gas Policy Act in 1978, the Secretary of Agriculture became responsible for certifying to the Federal Energy Regulatory Commission those uses which the Secretary deemed to satisfy the requirements of section 401(f)(1) for "essential agricultural uses." To discharge this duty, the Secretary began rulemaking proceedings to determine which uses would qualify for the agricultural priority. On 26 February 1979 the Secretary issued an Interim Final Rule which excluded the use of natural gas to fuel boilers for the production of heat from the section 401(f)(1)(B) priority, on the basis that use of natural gas as a boiler fuel is not use as a "process fuel."[12] In May of 1979 the Secretary issued a Final Rule which certified

"essential agricultural uses" without providing any further discussion of the question whether boiler fuel could ever be process fuel.[13]

After the issuance of the Final Rule, however, the Department of Agriculture received a number of inquiries asking whether any use of natural gas in a boiler could qualify as "process fuel" for purposes of section 401(f)(1)(B) of the Natural Gas Policy Act.[14] In response, the Acting Secretary of Agriculture issued a proposed rule defining "process fuel" to mean "the direct use of natural gas in a manufacturing process, and that use of natural gas in a boiler where the manufacturing process includes the boiler use of natural gas as an integral part of the process."[15] After public comment was received, the Secretary then promulgated the following definition of "process fuel":

"process fuel" means natural gas used to produce steam which in turn is directly applied in processing of products and for compression of products so that processing may take place, in addition to direct flame and precise heating applications of natural gas in processing of products. This does not include natural gas used for space heating, generation of hot water for plant cleaning and generation of electric power.[16]

The petitions now before us for review of the Secretary's definition were then filed in this court by the Process Gas Consumers Group and by the United Distribution Companies; later these cases were consolidated.

The petitioners raise two principal objections to the Secretary's definition. First, they contend that the Secretary does not have the authority under the Natural Gas Policy Act to define "process fuel" because under the Act the power to define technical and trade terms resides exclusively in the Federal Energy Regulatory Commission. And, second, they argue that the Secre-

---

12. 44 Fed.Reg. 11518, 11526 (1 March 1979).

13. 44 Fed.Reg. 28782, 28786 (17 May 1979).

14. *See* 44 Fed.Reg. 77187 (31 December 1979).

15. *Id.* at 77188.

16. 45 Fed.Reg. 27741, 27745 (24 April 1980) (to be codified in 7 C.F.R. § 2900.2(e)).

tary's definition is contrary to the intent of Congress, because at the time the NGPA was enacted Congress understood "process fuel" not to encompass "boiler fuel."

## III. ANALYSIS

### A. The Secretary's Authority to Define "Process Fuel"

■ In contending that the Secretary of Agriculture lacks the authority to define "process fuel," the petitioners rely chiefly on section 501 of the Act, which states that

[T]he [Federal Energy Regulatory] Commission is authorized to define, by rule, accounting, technical, and trade terms used in this Act. Any such definition shall be consistent with the definitions set forth in this Act.

The petitioners claim section 501(b) is in effect an exclusive grant of authority to the FERC that implicitly denies the Secretary of Agriculture the power to define statutory terms. To support this assertion they point out that the NGPA is a complex and detailed statute to be implemented by coordinated action not only of the Secretary of Agriculture, but also of the Secretary of Energy, the President of the United States, and the governors and utility commissions of the various states. Both the complexity of the statute and the multitude of decisionmakers involved in its implementation, argue the petitioners, suggest that Congress intended section 501(b) to be an exclusive grant of authority so that chaos would not break out in the interpretation and implementation of the Act.

Indeed, the dangers of inconsistent interpretation are apparent in the present case. The phrase "process fuel or feedstock" itself is used three times in the NGPA: first, in section 206(b)(3); second, in section 401(f)(1)(B); and third, in section 402. Each of these three sections is implemented by a different combination of decisionmakers. Under these circumstances, consistent application of the phrase "process fuel or feedstock" demands that the phrase not be too freely interpreted by any of the responsible agencies according to regulatory objectives peculiarly their own.

We are unpersuaded, however, that this line of reasoning leads to the conclusion that the Secretary lacks all power to define the terms of the Act. The statute makes clear that the Secretary is charged with the responsibility of certifying "essential agricultural uses" to the FERC. To do so, he must determine, if only tacitly or implicitly, which uses qualify under the statute as "essential agricultural uses"; some definition of "process fuel" is required before the Secretary can discharge his duty. But the statute itself does not, in so many words, define the phrase, and the FERC has not exercised its authority under section 501(b) to define it. So, unless the section 501(b) authorization of the FERC is taken to be mandatory, with the FERC responsible for providing the Secretary of Agriculture with a definition of "process fuel" before the Secretary carries out his responsibilities to certify "essential agricultural uses," the Secretary must have the power to construe the terms of the statute. The situation would be different, of course, if the FERC promulgated a definition of "process fuel" at variance with the definition being used by the Secretary of Agriculture. But until such time as the FERC sheds its own light on the meaning of "process fuel," the Secretary of Agriculture is left to construe his statutory directives on his own.

■ This is not to say, however, that the presence of section 501(b) in the statute does not affect the Secretary's power to define statutory terms even in the absence of a definition supplied by the FERC. The presence of section 501(b) clearly indicates that Congress intended the FERC—not the Secretary of Agriculture—to have primary responsibility for defining the many technical terms in the Act. So a novel definition, differing significantly from established previous usage created by an agency other than the FERC (Agriculture here), is not entitled to the same deference as would be a definition issuing from the FERC under the authority of section 501(b).

### B. Can "Boiler Fuel" Ever Be "Process Fuel"?

■ To understand what Congress meant in section 401(f)(1)(B) when it used the term

"process fuel" it is necessary to understand the regulatory context in which the term was used. Before 1978 interstate natural gas pipelines were regulated by the Federal Power Commission under the Natural Gas Act (NGA).[17] Under the general jurisdiction conferred by the NGA, the FPC regulated the delivery of natural gas during times when supply was inadequate to meet demand.[18] In the exercise of this authority to regulate curtailments of natural gas, the FPC established priorities on the basis of how the gas was being used—as feedstock gas, process gas, or boiler fuel—rather than on the basis of what product was being produced with the aid of the gas. The FPC's use-oriented curtailment policies generally provided that "boiler fuel" uses receive the lowest priority, with "feedstock" gas and "process gas" receiving higher priority.

Then, in 1978, Congress enacted the Natural Gas Policy Act, which provides specific congressional instructions for natural gas curtailment priorities. The directives contained in title IV of the new statute are generally product-oriented, rather than use-oriented. Following this pattern, section 401(f)(1), the section in dispute in the present litigation, defines the priority for "essential agricultural uses" to include the use of natural gas

    (A) for agricultural production, natural fiber production, natural fiber processing, food processing, food quality maintenance, irrigation pumping, crop drying, or

    (B) as a process fuel or feedstock in the production of fertilizer, agricultural chemicals, animal feed, or food. . . .

The priority established is thus primarily—but not exclusively—product-oriented. Both subsections (A) and (B) enumerate lists of product categories. Subsection (B), however, does impose a use-oriented limitation; natural gas used in the production of the product categories listed in that subsection is to be given a curtailment priority *only if it is used* "as a process fuel or feedstock."

On its face, then, the statute, read in the light of the definition of "process gas" and "boiler fuel" in use at the time it was enacted by Congress, establishes a purely product-oriented priority for those end product uses listed in subsection (A), and a *mixed* product- and use-oriented priority for the use and product categories listed in subsection (B). Reading the statute without further ado, it would appear that, for whatever reasons, Congress intended to provide the subsection (B) priority only to "process fuel" and "feedstock" uses, thereby excluding from the priority all "boiler fuel" uses. Such uses, which had been disfavored under the old FPC policies, appear to remain disfavored as applied to the end product categories in subsection (B), though not as applied to the end product categories in subsection (A).

It is difficult to see what other significance Congress could have intended to give to the limitation in subsection (B). Since no such limitation appears in subsection (A), Congress clearly intended that the priority for subsection (B) product categories be limited in a way that the priority for subsection (A) product categories is not. And given that, at the time Congress enacted the NGPA, natural gas uses were commonly divided into three more or less mutually exclusive categories—feedstock gas, process gas, and boiler fuel—it is difficult to read subsection (B), which expressly includes only two of those three—process fuel and feedstock uses—as not being intended to exclude the third—boiler fuel. Thus, looking only at the plain meaning of the words, and without indulging in judicial acrobatics, the intent of the statute seems obvious: the section 401(f)(1)(B) priority does not extend to the use of natural gas as a "boiler fuel."

This reading, moreover, is not strained or unreasonable. It is not hard to imagine that Congress, in creating a new curtailment policy for natural gas based primarily on end product categories, would nonethe-

---

17. 15 U.S.C. §§ 717–717w (1976).

18. *See FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972); 18 C.F.R. § 2.70 (1972).

less retain those vestiges of the old use-oriented system it believed worthwhile. The use-oriented priority scheme adopted by the FPC, after all, did have a sound basis in policy. For when natural gas is used as "process gas" as defined by the FPC, it is used not only for its capacity to produce heat—an attribute it shares with other fuels—but also for its almost unique ability to produce a uniform flame whose temperature and shape can be precisely controlled. When used as "boiler fuel" as defined by the FPC, on the other hand, only the heat-producing capacity of the natural gas is exploited, because boilers do not demand precise temperature and flame control or almost instantaneous response. Thus, in many applications there may be no feasible substitute for natural gas when used as a "process gas," but, apart from the limitations of individual boilers, there almost always are other fuels that can be physically substituted for natural gas used as "boiler fuel." This explains the curtailment priorities established by the FPC under which use of natural gas as a boiler fuel was disfavored relative to use of natural gas as a feedstock or process fuel.

It may also explain why Congress limited the priority for the section 401(f)(1)(B) end product categories to uses of natural gas "as a process fuel or feedstock." An inspection of the end product categories found in sections 401(f)(1)(A) and 401(f)(1)(B) suggests that in subsection (A) Congress enumerated uses of natural gas for the *direct* production of human food and fiber, whereas in subsection (B) Congress referred to end product categories only *indirectly*—albeit importantly—involved in the production of human food (or fiber). Thus, in subsection (A) Congress lists "agricultural production, natural fiber production, natural fiber processing, food processing, food quality maintenance, irrigation pumping, [and] crop drying." These uses all directly contribute to the production and processing of human food and fiber. In subsection (B), on the other hand, Congress has listed the use of natural gas in the production of fertilizer, agricultural chemicals, animal feed, or food. These less direct input factors in the production of human food and fiber plausibly could have been considered by Congress to be of lesser importance than the direct uses in subsection (A). It is possible to understand, therefore, why Congress may have thought it appropriate to limit the curtailment priority for this second set of indirect and animal uses to applications in which the unique properties of natural gas are exploited, that is, applications of natural gas "as a process fuel or feedstock."

A straightforward reading of section 401(f)(1)(B) is thus supported by a plausible basis upon which Congress may have decided to retain a vestige of the old use-oriented scheme as part of the new end product-oriented priority system of the Natural Gas Policy Act.

The Secretary of Agriculture nonetheless has promulgated a definition of "process fuel" which includes natural gas used as a boiler fuel. In defense of this broader definition, the Secretary makes two principal points.

First, the Secretary begins by noting that the old FPC definition of "process gas" is based on the technical feasibility of substituting another fuel in the place of natural gas; under the FPC definition process gas is natural gas used where "alternate fuels are not *technically feasible* such as in applications requiring precise temperature controls and precise flame characteristics."[19] This "technically feasible" standard is consistent with the curtailment policies of the FPC prior to the enactment of the Natural Gas Policy Act. The NGPA, however, imposes a less restrictive standard in section 401(b): the "essential agricultural use" priority cannot be invoked if a fuel other than natural gas is *"economically practicable"* and *"reasonably available"* as an alternative. Section 401(b) thus overrides the priority scheme whenever an alternative fuel is available and economically practicable. If the very definition of process fuel incor-

---

**19.** 18 C.F.R. § 2.78(c) (1974) (emphasis added).

porates the old FPC "technically feasible" standard, however, this override can have no purpose as applied to section 401(f)(1)(B) "process fuel" uses. Section 401(b) would then be robbed of effect as applied to section 401(f)(1)(B), and would significantly limit only the boiler fuel priorities under section 401(f)(1)(A).

The Secretary's point is not without some force, though perhaps we should not be surprised to find in a statute as complex as the Natural Gas Policy Act such a minor imperfection of the draftsman's art in which a limiting provision such as section 401(b) seemingly applies both where it can have an effect—on section 401(f)(1)(A)—as well as where it cannot—on the "process fuel" fork of section 401(f)(1)(B). The Secretary's argument would be more persuasive, however, if the Secretary's own definition of "process fuel" did not create a similar problem of its own. In particular, the Secretary's definition blurs the distinction between section 401(f)(1)(A) and (B) uses. If, as the Secretary suggests, Congress did not intend to exclude boiler fuel uses from the subsection (B) priority, one is left with the questions of what Congress did intend to exclude or why Congress went to the trouble of bifurcating section 401(f)(1) into two subsections. Those questions appear to us no easier to answer than the question posed by the Secretary regarding the application of section 401(b) to section 401(f)(1)(B).

Moreover, it is difficult to see how Congress could have intended to use the term "process fuel" in the novel way the Secretary suggests without providing somewhere—if not in the statute itself, at least in the legislative history—some indication that the term was being used to designate something other than that which previously had been designated by "process gas." It is hard to believe that Congress intended to adopt a novel denotation for "process fuel" without anywhere giving an indication of that intent.

In sum, while we cannot deny the force of the Secretary's argument with respect to

the apparent inapplicability of section 401(b) to section 401(f)(1)(B), we remain unpersuaded that Congress did not have the FPC definition in mind.

The Secretary's second principal argument is based on an extrapolation from Congress' overall purpose in enacting title IV of the Act: assuring "full food and fiber production." [20] According to the Secretary, this objective can better be met through an expansive rather than a narrow definition of the "essential agricultural use" priority found in section 401(f)(1)(B). But while it is clear from the Act and its legislative history that Congress did intend to give a special advantage to agricultural uses of natural gas, such a broad objective is not inconsistent with careful congressional tailoring of the means by which that objective would be realized. In particular, while Congress was solicitous of "essential agricultural uses," it also gave consideration to the needs of natural gas users in lower priority categories. In working out the resulting compromises, it is not surprising that Congress would introduce limitations of the sort it added to section 401(f)(1)(B). We thus see no fundamental inconsistency between the manifest intent of the Congress in enacting title IV of the Natural Gas Policy Act and a straightforward interpretation of the meaning of the limitation to "process fuel or feedstock" in section 401(f)(1)(B).

## V. CONCLUSION

We therefore conclude that, for purposes of section 401(f)(1)(B), "process fuel," whatever else it might mean, does not mean boiler fuel. This is not a case in which a court must defer to the construction of a new statute adopted by the agency responsible for its implementation. In the present case the promulgation of definitions has been explicitly assigned to the Federal Energy Regulatory Commission, not the Secretary of Agriculture. The Secretary of Agriculture is not responsible for administering the Natural Gas Policy Act in its entire-

**20.** 15 U.S.C. § 3391(f)(1) (Supp.1979).

ty, but solely for that portion of the Act which deals with the curtailment priority for "essential agricultural uses." The Secretary of Agriculture, unlike the Federal Energy Regulatory Commission, does not have responsibility for balancing the various competing interests affected by the Act. While we do not decide the larger question of what "process fuel" means under the Act, we do conclude that Congress believed that "process fuel" does not include boiler fuel. The Secretary's definition published 24 April 1980 is not in accord with the Act and is therefore

*Vacated and Set Aside.*