The CITY OF MESA, ARIZONA; The City of Las Cruces, New Mexico; The Navajo Tribal Utility Authority, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

American Public Gas Association; Apache Nitrogen Products, Inc.; Arizona Public Service Company; Phelps Dodge Corporation; Salt River Project Agricultural Improvement and Power District; Asarco, Inc.; Cyprus Miami Mining Corporation; Magma Copper Company; El Paso Electric Company; El Paso Natural Gas Company; Foothills Pipe Lines Ltd.; Gas Company of New Mexico; Meridian Oil Inc.; Mobil Producing Texas & New Mexico Inc.; Mobil Natural Gas Inc.; Pacific Gas and Electric Company; Pan–Alberta Gas Ltd.; Process Gas Consumers Group; Public Utilities Commission of the State of California; Saguaro Power Company, a Limited Partnership; Southern California Edison Company; Southern Union Gas Company; Southwest Gas Corporation; The United Distribution Companies; Western Gas Resources, Inc., Intervenors.

No. 91–1499.

United States Court of Appeals, District of Columbia Circuit.

Argued March 2, 1993.

Decided May 25, 1993.

John P. Gregg, with whom Susan N. Kelly and Eric A. Bilsky, were on the brief, for petitioners.

Jill Hall, Attorney, F.E.R.C., with whom William S. Scherman, Gen. Counsel, and Jerome M. Feit, Sol., F.E.R.C., were on the brief, for respondent.

William H. Penniman, with whom Joel L. Greene, Barbara S. Jost, Merek E. Lipson, Patrick G. Golden, David W. Anderson, Paul H. Keck, and Nicholas W. Fels were on the joint brief, for intervenors and amicus curiae.

Roberta L. Halladay, Christopher J. Barr, and Kristine L. Delkus were on the brief, for amicus curiae United Distribution Companies.

Britton White, Jr., Richard C. Green, and Mary Anne Mason were on the brief, for intervenor El Paso Natural Gas Co.

Joel L. Greene and Barbara S. Jost entered appearances for intervenors Apache Nitrogen Products, Inc., Arizona Public Service Co., Phelps Dodge Corp., and Salt River Project Agr. Imp. and Power Dist.

Shippen Howe and John R. Staffier entered appearances, for intervenor Pan–Alberta Gas Ltd.

John B. Rudolph entered an appearance, for intervenor Western Gas Resources, Inc.

Nicholas W. Fels entered an appearance, for intervenors ASARCO, Inc., Cyprus Miami Min. Corp., and Magma Copper Co.

Shippen Howe and George W. McHenry, Jr., entered appearances, for intervenor Foothills Pipe Lines Ltd.

James F. Moriarty entered an appearance, for intervenor Southern Union Gas Co.

Irving J. Golub entered an appearance, for intervenor Gas Co. of New Mexico.

William H. Penniman entered an appearance, for intervenor Process Gas Consumers Group.

Harvey Y. Morris, Peter Arth, Jr., and Edward W. O'Neil entered appearances for intervenor Public Utilities Com'n of State of Cal.

William T. Miller entered an appearance, for intervenor American Public Gas Ass'n.

David W. Anderson and Merek E. Lipson, Patrick G. Golden, and Paul H. Keck entered appearances, for intervenor Pacific Gas and Elec. Co.

Peter G. Esposito entered an appearance, for intervenor Saguaro Power Co., A Ltd. Partnership.

John C. Walley entered an appearance, for intervenor Southwest Gas Corp.

J. Michel Marcoux entered an appearance, for intervenor El Paso Elec. Co.

Before MIKVA, Chief Judge, WALD and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

This case is yet another progeny of the Federal Energy Regulatory Commission's ("FERC" or "Commission") recent efforts to foster competition in the natural gas industry by "unbundling"—separating—the sale of gas from its transportation. Pipelines formerly transported gas exclusively or principally in conjunction with sales of their own product; now, pipelines transport gas whether it is their own or has been purchased from a third party. This sea change in the natural gas industry has inevitably raised new issues

concerning a pipeline's duty to its shippers in cases of capacity constraint, *i.e.,* when because of *force majeure* or other circumstances the demand for transportation of gas from a pipeline's contractual customers outstrips the capacity of the pipeline. The Cities of Mesa, Arizona, and Las Cruces, New Mexico, and the Navajo Tribal Utility Authority (collectively, the "petitioners") raise two such questions here. First, they contend that § 401 of the Natural Gas Policy Act ("NGPA"), which requires plans for "curtailment of deliveries of natural gas" to ration the resource on the basis of end-use rather than *pro rata* across all customers, applies to unbundled transportation service. If they are right, the FERC erred in approving an El Paso Natural Gas Company ("El Paso") plan that curtailed shippers *pro rata* during shortages caused by capacity constraint. We ultimately reject this argument, however, because § 401 itself is ambiguous as to its application to capacity constraints affecting unbundled transportation service and the FERC's conclusion that it should not apply to those circumstances is reasonable. Second, the Petitioners claim that the FERC's approval of El Paso's capacity curtailment plan contravenes the consumer protection requirements of the Natural Gas Act ("NGA") because it does not assure that "high-priority" end-users—residential customers, schools, hospitals, and others for whom even short-term cut-offs of gas may have serious consequences—will have continuous access to gas. On this point, we find that the FERC has not sufficiently explained its conclusion that El Paso's plan fulfills NGA consumer protection requirements; accordingly, we remand that question to the Commission.

## I. BACKGROUND

On August 31, 1990, El Paso submitted for the Commission's approval a proposed "Global Settlement" of a slew of outstanding regulatory proceedings in which it was involved. A cornerstone of the proposed multiparty settlement was El Paso's agreement to unbundle its services. More specifically, El Paso offered to convert all of its customers' "bundled" entitlements to gas supply *and* transportation on the pipeline into transportation[1] entitlements alone. This transformation, which the Commission had strongly encouraged all pipelines to undertake, *see* Order No. 436, 50 Fed.Reg. 42,408 (1985) (providing incentives for pipelines to offer unbundled services), would permit El Paso customers heretofore dependent on the pipeline for both supply and carriage of gas to choose whether to buy gas from El Paso or from a third party. *Cf. Associated Gas Distributors v. FERC,* 899 F.2d 1250, 1254 (D.C.Cir.1990) (noting that before unbundling, pipelines "refuse[d] to transport gas for parties other than those who bought gas directly from them"). It would also mean that the ownership of the gas flowing through its pipelines would not lie with El Paso but rather with its transportation customers, mostly local distribution companies ("LDCs") and large utilities. Under El Paso's old "bundled" scheme, it purchased the gas from the well-head producer, transported it through its pipelines, and *then* sold it to LDCs and utilities at their "city gates." Under the proposed Global Settlement, the LDCs and utilities would buy gas from a supplier, either El Paso or a third party, at "mainline receipt points" in gas production areas; from that point, El Paso would transport (or "provide capacity for") the gas already bought by the LDCs and utilities.

As part of this seismic restructuring, El Paso proposed a *pro rata* method of "curtailing" its new unbundled transportation customers, *i.e.,* reducing the amount of gas they received in *force majeure* or other circumstances[2] when El Paso lacked the capacity

---

1. Because natural gas is fungible, a pipeline need not physically move any specific supply of gas to particular customers. There are a variety of ways, including "exchanges," "backhauling," and "displacement," by which pipelines can assure that a shipper receives the same quantity of gas that it puts on the pipeline. *See Associated Gas Distributors v. FERC,* 899 F.2d 1250, 1254 n. 1 (D.C.Cir.1990). This opinion will use the term "transportation" to include all these mechanisms.

2. The parties differ as to the circumstances that give rise to a "capacity constraint" curtailment. Petitioners contend that a capacity constraint exists when there is either "overbooking" (oversubscription) of pipeline capacity during times of extreme weather conditions or a *force majeure*

on its pipeline simultaneously to meet all its transportation customers' demands. Until the Global Settlement, the method of allocating scarce pipeline capacity during an emergency was not a major problem for El Paso and its customers. Nearly the entire capacity of the pipeline was devoted to meeting El Paso's bundled sales obligations, *i.e.*, to transporting El Paso-owned gas to sales customers' city gates. Thus, almost all of El Paso's capacity was subject to the curtailment plan covering its *sales* of gas; if El Paso could not make good on all its sales obligations—because of either a capacity constraint or, more likely, a supply shortage—it would look to the end use of the gas in deciding which customers it would curtail. El Paso's plan adopted the end-user pecking order mandated by NGPA § 401, 15 U.S.C. § 3391(a), for "curtailment[s] of deliveries" of natural gas: "high-priority" end-users received gas first, then "essential agricultural" end-users, and on down the statutorily mandated line. *See generally Process Gas Consumers Group v. United States Department of Agriculture,* 657 F.2d 459, 460 ((D.C.Cir. 1981) (summarizing the curtailment priorities required by § 401). But as part of its unbundling proposal, El Paso now sought to apply different curtailment plans to its newly-distinct transportation and sales services. For supply-based curtailments affecting its sales of gas at the mainline receipt points in the production area, El Paso would still apply an end-use curtailment plan. But for capacity constraint curtailments affecting its transportation service from the mainline receipt points, it proposed to apply a *pro rata* scheme. Scarce capacity would go first—"off the top"—to El Paso's smallest firm transportation customers (those served under Rate Schedule FTS–S); the remainder would be divvied up among the rest of the firm customers (served under Rate Schedule T–3) *pro rata, i.e.,* firm transportation customers would get a percentage of the available capacity equal to the percentage of El Paso's overall capacity they had contracted for.

The El Paso Municipal Consumer Group (the "Municipal Group"), an organization that includes the petitioners, LDCs served under the T–3 Rate Schedule, as well as smaller LDCs served under the FTS–S Rate Schedule, argued to the FERC that El Paso's plan should be modified to require scarce capacity to be allocated to protect the high-priority end-users they served. The Commission, however, rejected their proposal and on March 20, 1991, issued an order approving the Global Settlement, including its *pro rata* capacity constraint curtailment provisions. Explaining its decision, the Commission said that since the Global Settlement gave the small FTS–S customers capacity "off the top" in periods of capacity constraint, the Municipal Group's objections were either "moot or resolve[d] ... to a very great degree in [its] favor." Additionally, it pointed out, the parties had not agreed to an end-use-based plan and the FERC was reluctant to impose such a plan absent a showing that the *pro rata* plan would inflict harm on the high-priority consumers served by the Municipal Group. Finally, the Commission emphasized that § 401 of the NGPA, the provision that mandated an end-use plan for curtailments of El Paso's bundled sales and transportation service, applied only to *supply*-based curtailments and said nothing about capacity constraint curtailments of unbundled transportation service.

The Municipal Group's petition for rehearing of the FERC's order was denied on August 14, 1991. The petition highlighted two alleged weaknesses in the FERC's original order. First, the Municipal Group contended that the order was inconsistent with Title IV of the NGPA, and particularly § 401, which focused on the health and safety consequences of the failure of high-priority users to receive gas, not on whether that failure was caused by a capacity constraint or a supply shortage. In response, the Commission reiterated its position that the NGPA, which Congress passed in the context of the chronic natural gas supply shortages of the late 1970s, was designed to deal only

problem (*e.g.,* a compressor station failure or a break in the line). *See* Petitioners' Brief at 9. The FERC asserts that only when a pipeline cannot deliver scheduled volumes of gas due to a

*force majeure* is there a capacity constraint. *See* FERC Brief at 9. Our analysis does not turn on the resolution of that definitional question.

with curtailments resulting from supply shortages and not situations in which a pipeline is unable to move gas to all its transportation customers. Second, the Municipal Group argued that the "consumer protection provisions" of the NGA, 15 U.S.C. §§ 717c and 717f(e) (requiring, respectively, that rates be "just and reasonable," and that natural gas transactions be "required by the present or future public convenience and necessity"), obligated the Commission to modify El Paso's capacity curtailment plan in order to ensure that El Paso provided continuous and reliable service to high-priority end-users. In this regard, the Municipal Group stressed that, contrary to the FERC's assumption in its original order, not all of its members were covered by El Paso's "off-the-top" protection for the small Rate Schedule FTS–S transportation customers. Because of their size, the three petitioners were served under Rate Schedule T–3, and, accordingly, were ineligible for "off-the-top" protection even though they served high-priority end-users almost exclusively and those end-users would be left high and dry in the event of a capacity constraint. The Commission, again highlighting the absence of firm evidence of the need for an end-use plan and citing the "off-the-top" protection for the FTS–S customers, rejected the NGA argument as well.

## II. DISCUSSION

The petitioners press on appeal the same two arguments advanced in their rehearing petition to the FERC. We address them in turn.

### A. *The NGPA Claim*

Section 401(a) of the NGPA states in pertinent part:

[T]o the maximum extent practicable, no curtailment plan of an interstate pipeline may provide for curtailment of *deliveries* of natural gas for any essential agricultural uses, unless such curtailment—

. . . . .

(2) is necessary in order to meet the requirements of high-priority users.

15 U.S.C. § 3391(a) (emphasis added). Petitioners cite this provision as clear proof that Congress, in enacting the NGPA, intended to shield high-priority end-users from all forms of curtailment. Seizing on Congress' use of the allegedly inclusive term "deliveries" instead of "sales" or "transportation" (which are used elsewhere in the NGPA), petitioners contend that § 401's plain language applies to capacity constraint curtailments affecting unbundled transportation services as well as supply problems affecting sales services. Additionally, they argue that only their expansive reading of § 401's ambit is consistent with Congress' evident concern with the *effect* of curtailments on high-priority users. Whether a curtailment is *caused* by a capacity constraint or a shortage of gas, it creates the same health and safety hazards to residences, hospitals, and other high-priority end-users that might have to do without gas; accordingly, § 401 must sensibly be read to apply to unbundled transportation service as well as bundled sales and transportation service.

The FERC takes issue with petitioners' argument. It maintains that the text and legislative history of the NGPA as well as the historical context in which it was enacted lend support to its position that Congress, by using the term "deliveries" in § 401, intended to mandate end-use curtailments only in situations involving the sale of natural gas. According to the Commission, Congress in that pre-deregulation era had no occasion to consider the issue of capacity curtailments affecting customers using unbundled transportation service, and it cannot be taken to have intended to tie the FERC's hands in dealing with problems in pipeline/customer relations that are totally different from those that existed when it legislated.

Our analysis of these interpretive arguments about the scope of § 401 must of course follow the analytical path laid down by *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* requires us to determine first whether, employing traditional means of statutory construction, we can espy a clearly expressed congressional intent on the *precise* question at

hand; if we can, that meaning controls, notwithstanding any contrary agency interpretation. *See id.* at 842–43, 104 S.Ct. at 2781; *see also Public Employees Retirement System v. Betts,* 492 U.S. 158, 171, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989) ("[N]o deference is due to agency interpretations at odds with the plain language of the statute itself."). But, if Congress has not spoken unambiguously, our inquiry is limited to determining whether the construction proffered by the agency, here the FERC, is reasonable. *See Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781; *see also Pauley v. BethEnergy Mines, Inc.,* —— U.S. ——, ——, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991) (since "the resolution of ambiguity in a statutory text is often more a question of policy than of law," judicial review of an agency's construction of ambiguous statutory terms is "limited"). Moreover, deference to the agency's resolution of any statutory ambiguity seems especially appropriate in this case since the interpretation at issue is both long-standing and consistent. *See, e.g.,* Order No. 29–C, FERC Statutes & Regulations, Regulations Preambles, 1977–81 Transfer Binder, ¶ 30,-092 at 30,680 (1979) (refusing to extend end-use requirements to capacity curtailments); Order No. 436–A, FERC Statutes & Regulations, Regulations Preambles, 1982–85 Transfer Binder, ¶ 30,675 at 31,652–53 (1985) (holding that Title IV of the NGPA applies only to supply shortages); *see also* Application for Rehearing and Request for Clarification of the El Paso Municipal Consumer Group, *In the Matter of El Paso Natural Gas Co.,* FERC Docket Nos. RP88–44–018, *et al.,* April 19, 1991, at 12 (acknowledging that the FERC has long interpreted § 401 as applying only to supply shortages); *cf. EEOC v. Associated Dry Goods Corp.,* 449 U.S. 590, 600 n. 17, 101 S.Ct. 817, 823 n. 17, 66 L.Ed.2d 762 (1981); *Middle South Energy, Inc. v. FERC,* 747 F.2d 763, 769 (D.C.Cir.1984), *cert. dismissed,* 473 U.S. 930, 106 S.Ct. 22, 87 L.Ed.2d 700 (1985). Applying the *Chevron* framework here, we conclude for several reasons that it is unclear whether Congress

meant to mandate end-use-based curtailments for unbundled transportation and that the FERC's interpretation to the contrary is both reasonable and consistent with the general thrust of the NGPA.

First, the use of the word "deliveries" in § 401 does not convey an unambiguous intent to cover pure transportation service as opposed to transportation of pipeline gas bundled with the later sale of that gas. Naturally, we try not to interpret statutory language by plucking a single word out of context and placing it under a microscope. Rather, mindful of "the cardinal rule that a statute is to be read as a whole since the meaning of statutory language, plain or not, depends on context," *King v. St. Vincent's Hospital,* —— U.S. ——, ——, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991) (internal citation omitted), we look to the use of that word elsewhere in the statute as well. Here, we find that in Title III of the NGPA, Congress referred to "deliveries or transportation" of gas. *See* 15 U.S.C. § 3363(g)(1) ("If the parties ... fail to agree upon the terms of compensation for natural gas deliveries or transportation required pursuant to such order...."). This legislative tidbit is certainly not conclusive, but it does suggest that the drafters' understanding of the word "deliveries" did not necessarily encompass mere transportation of nonpipeline gas. *See, e.g., United States v. Barker Steel Co.,* 985 F.2d 1123, 1131 (1st Cir.1993) ("Whenever possible, we will not interpret a statute in such a way as to cause redundancy.").[3]

That suggestion gains additional force from the use of the term "deliveries" in comments found in pre-NGPA documents issued by the Federal Power Commission ("FPC"), the FERC's predecessor. Mid–1970s FPC policy statements applying only to curtailments of *sales* repeatedly used the key term "deliveries." *See, e.g.,* Order No. 467, 49 FPC 85, 85 (1973) ("This order contains a statement of policy by the Commission on priorities-of-deliveries by jurisdictional pipeline companies during periods of curtailment."). Thus, by using that same term

---

**3.** Some additional doubt as to the inevitability of the petitioners' reading of § 401 is created by Title I of the NGPA, where the word "deliver" is defined in terms of the *sale,* not the transporta-

tion, of gas. *See* 15 U.S.C. § 3301(22) ("The term 'deliver' when used with respect to any first sale of natural gas, means the physical delivery from the seller....").

of art in the NGPA, Congress may have been confining § 401's requirements to the "deliveries" covered by the prior FPC directives, *i.e.*, transportation services bundled with sales of pipeline gas.

The final blow to petitioners' claim of clarity comes from the legislative history of the NGPA. The Conference Report stresses in no uncertain language that Congress sought to assure that the enactment of the law would only minimally disrupt existing curtailment plans: "[T]he Commission is instructed to reopen curtailment plans that are already in effect under the Natural Gas Act only to the extent necessary to adjust those plans to bring them into conformity with the new curtailment priority schedule. The conferees were concerned that the[ ] changes [enacted through § 401] not burden the Commission with lengthy proceedings which might throw existing curtailment plans into disarray." H.R. REP. No. 1752, 95th Cong., 2d Sess. 113 (1978), U.S.Code Cong. & Admin.News 1978, pp. 8800, 9029–30. Requiring end-use curtailment plans for transportation of nonpipeline gas would have precipitated the very "disarray" that Congress disclaimed any intent to create. At the time the NGPA was enacted, the FPC did not require end-use curtailment plans for pipelines' transportation of third-party-owned gas. *See* Order No. 533–A, 54 FPC 2058, 2059 (1975); *see also American Public Gas Association v. FERC*, 587 F.2d 1089, 1098 (D.C.Cir.1978) (affirming, in a pre-NGPA opinion, FERC's Order No. 533 program exempting transportation of third-party-owned gas from curtailment programs because "the purpose of a curtailment plan is to prescribe the manner in which a pipeline that cannot meet its contractual commitments will curtail deliveries of its *own* gas") (emphasis in original). Thus, if § 401 were read to cover nonpipeline-owned gas, all these curtailment plans would have had to have been modified, something Congress was intent on avoiding.

While no single one of these pieces of evidence may demonstrate incontestably that Congress had a specific intent *not* to require end-use curtailment plans for unbundled

transportation service, they do suffice cumulatively to pierce the petitioners' shield of inviolability on the meaning of "deliveries" in § 401 and so require us to move to the second step of *Chevron* analysis. At that stage, the FERC's interpretation of § 401 as applying to bundled sales and transportation but not to transportation alone easily survives limited review. We think that the context in which the NGPA was passed militates especially strongly toward the reasonableness of the FERC's interpretation of § 401. Although there had always been the possibility of capacity constraints caused by *force majeure* accidents on the pipeline, it was not until the chronic supply shortages of the 1970s that first the FPC, *see* Order No. 467, 49 FPC 85 (1973), and then Congress mandated end-use-based curtailment plans. The contemporaneous evidence surrounding the passage of the NGPA leaves no doubt that it was this pressing problem of supply shortages that spurred its enactment.[4] Against that backdrop, the FERC might reasonably conclude that Congress, in enacting § 401, had in mind the limited goal of coping with supply shortages. *See Atlanta Gas Light Co. v. FERC*, 756 F.2d 191, 196–97 (D.C.Cir. 1985) (Scalia, J.) (approving, under *Chevron*'s second step, the FERC's narrow construction of § 401 as not applying to curtailment of supplies of "authorized overrun" gas because applying § 401 to that service would have extended that provision beyond its core purpose of providing a means of allocating gas among those who had a contractual entitlement to it during supply shortages).

Finally, contrary to the petitioners' argument, the Commission's more limited interpretation of § 401 is not rendered unreasonable by the fact that high-priority users suffer equally from supply and capacity curtailments. There are important differences between the two kinds of constraints. Supply shortages usually lead to prolonged periods in which there is simply too little gas to serve the needs of all users. In contrast, capacity constraints occur when there is enough gas in the market but an unexpected event has caused a brief interruption in the movement

---

4. The legislative history is peppered with references to the supply problem. *See, e.g.,* H.R. REP.

No. 95–543, 95th Cong., 2d Sess., Vol. II, 383–92 (1977).

of the gas to consumers. Additionally, capacity constraints, unlike supply shortages, may only affect movement of gas on *part* of a pipeline, thereby allowing customers to receive their quota of gas by using alternate routes that skirt the pipeline bottleneck. These differences mean that pipeline customers can more easily adopt self-help measures to protect their high-priority end-users against the harmful effects of capacity curtailments than supply shortages. For example, according to the FERC, transportation customers can guard against capacity constraints by, among other things, utilizing a diverse portfolio of pipeline suppliers, maintaining backup supplies in storage, and, finally, using private contracts to buy capacity from pipeline customers who serve less essential end-users. *See* Order No. 636–A, III FERC Statutes & Regulations, Regulations Preambles, ¶ 30,950, at 30,590 (1992). Thus, even if petitioners are right that Congress was animated by a general desire to protect high-priority consumers against the effects of all kinds of curtailments, the FERC could reasonably conclude that with capacity constraints, unlike supply shortages, transportation customers can generally "fend for themselves," so as to protect their high-priority end-users without relying on end-use-based curtailment plans.

**B.** *The NGA Claim*

■ The petitioners also allege that the FERC violated § 4 and § 7(e) of the Natural Gas Act, 15 U.S.C. §§ 717c & 717f(e), by not modifying the Global Settlement to ensure that their high-priority end-use customers receive a continuous supply of natural gas. It is well-established—and the FERC does not contest—that § 4, which requires that rates be "just and reasonable," and § 7(e), which requires that all natural gas transactions meet the test of "present or future public convenience and necessity," oblige the Commission to protect the ultimate consumers of gas. *See Atlantic Refining Co. v. Public Service Commission,* 360 U.S. 378, 388, 79 S.Ct. 1246, 1253, 3 L.Ed.2d 1312

(1959). As the FERC's counsel acknowledged at oral argument, implicit in this consumer protection mandate is a duty to assure that consumers, especially high-priority consumers, have continuous access to needed supplies of natural gas. *See Sunray Mid-Continent Oil Co. v. FPC,* 239 F.2d 97, 101 (10th Cir.1956) ("No single factor in the Commission's duty to protect the public can be more important to the public than the continuity of service furnished."), *rev'd on other grounds,* 353 U.S. 944, 77 S.Ct. 792, 1 L.Ed.2d 794 (1957); *cf. Tejas Power Corp. v. FERC,* 908 F.2d 998, 1003 (D.C.Cir.1990) ("[T]he public interest that the Commission must protect always includes the interest of consumers in having *access* to an adequate supply of gas at a reasonable price.") (emphasis added).[5]

■ The issue, then, is not whether the FERC has an NGA obligation to assure protection of high-priority end-users during periods of curtailment, but whether it properly discharged that obligation in approving the proposed settlement in this particular case. *See id.* (the Commission must exercise its independent judgment in determining whether a proposed settlement is consistent with NGA requirements). Of course, since the NGA gives the FERC no specific guidance as to how to apply its broad mandates in a particular case, our review of the FERC's actions here is, again, quite limited. *Cf. City of Charlottesville v. FERC,* 661 F.2d 945, 949–50 (D.C.Cir.1981) (noting the "paucity of statutory guidance" given by the NGA and the resulting deferential review of FERC decisions as to what is just and reasonable). We do not substitute our judgment for that of the Commission as to what steps are necessary to protect consumers from capacity constraint curtailments; rather, our task is merely to ensure that the FERC "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Manufacturers Association v. State Farm Mutual*

---

**5.** Indeed, it was largely from these NGA provisions that the FPC drew its authority to promulgate its pre-NGPA policies requiring curtailment plans to protect high-priority end-users. *See* Order No. 467, 49 FPC 85, 87 (1973) (citing, *inter alia,* § 4 and § 7 of the NGA as authorizing policy mandating end-use-based plans for curtailments).

*Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (internal quotation omitted); *accord Tenneco Gas v. FERC,* 969 F.2d 1187, 1196 (D.C.Cir. 1992) (per curiam); *see also Mobil Oil Corp. v. FPC,* 417 U.S. 283, 308, 94 S.Ct. 2328, 2345, 41 L.Ed.2d 72 (1974) (Commission's decisions as to what is just and reasonable will be affirmed if supported by substantial evidence, Commission did not exceed or abuse its authority, and Commission has given reasoned consideration to relevant factors) (quoting *Permian Basin Area Rate Cases,* 390 U.S. 747, 791–92, 88 S.Ct. 1344, 1372–73, 20 L.Ed.2d 312 (1968)); *Great Lakes Gas Transmission Limited Partnership v. FERC,* 984 F.2d 426, 432 (D.C.Cir. 1993) (FERC's powers under § 7(e) are "extremely broad"; a reviewing court looks only to whether FERC's decision is "reasoned, principled, and based upon the record") (internal quotation omitted).

 The most important factor in this mode of review is the agency's own explanation for its decision. Accordingly, we set out the FERC's reasoning relevant to its NGA obligations in full. In its initial order, the Commission explained:

> [T]he settlement already removes the small Rate Schedule FTS–S transportation customers from the pro rata process and permitting [sic] them to get their gas "off the top," up to each such customer's volumetric levels for a representative period. This either renders the [Municipal] Group's arguments moot or resolves them to a very great extent in the [Municipal] Group's favor. The Commission is reluctant to order an end-use specific transportation-capacity curtailment plan absent the agreement of the parties and absent a record.... [T]he [Municipal] Group has not made a showing that it will be curtailed inconsistently with existing end-use supply curtailment criteria in spite of their first priority for exempted customers. The Commission concludes that this "off the top" treatment adequately protects high-priority users.

On rehearing, after the Municipal Group had stressed that three of its members—the petitioners here—were ineligible for "off-the-top" protection because of their size, the Commission said:

> As there is no legal requirement [in the NGPA] for the imposition of [an end-use-based plan], the Commission will not force one upon a pipeline absent evidence of a need to do so. In the absence of evidence of such a need or of such legal requirement, the Commission finds that El Paso has adequately provided for the need of high priority uses. While customers' rights to capacity will not be curtailed in exactly the same manner as under the existing end-use supply curtailment criteria, the Commission finds that El Paso's pro rata capacity curtailment plan, with its "off the top" capacity allocation treatment for small sales customers under Rate Schedule FTS–S, adequately protects most small high-priority end-users. [The Municipal Group is], in essence, requesting that the Commission exercise its power under section 5 of the NGA to find El Paso's existing tariff unjust and unreasonable.[6] The Commission declines to do so here. The Commission cannot find that El Paso's capacity curtailment plan is unjust and unreasonable.

These explanations, unfortunately, do not suffice to demonstrate that the Commission engaged in reasoned decisionmaking. In its order denying rehearing, the FERC stated: "[T]he Commission finds that El Paso's pro rata capacity curtailment plan, with its 'off the top' capacity allocation treatment for small sales customers under Rate Schedule FTS–S, adequately protects *most* small high-priority end-users." (emphasis added). Read by itself, this statement suggests, as the petitioners argue, that the FERC believed that a plan that safeguards only *some* high-priority users fulfills the NGA's consumer protection requirements. This puzzling position is never defended in the orders and on its face seems arbitrary and capri-

---

**6.** Although the Commission treated the Municipal Group's argument under §§ 4 and 7(e) as "essentially" one under § 5 (which, like § 4, requires that rates be "just and reasonable"),

neither party contends that there is any difference between those provisions for purposes of the consumer protection requirement at issue in this case.

cious; we do not think it "reasoned decision-making" to approve a settlement that the Commission suspects will leave some high-priority end-users quite literally out in the cold.

But perhaps the FERC did not mean its orders to stand for this facially unreasonable proposition. The Commission did in fact make several statements suggesting that it believed that El Paso's plan would protect all—not just most—high-priority users. Most importantly, in its rehearing order, the Commission said that it "finds that El Paso has *adequately* provided for the need of high priority uses." (emphasis added). Thus, as its counsel suggests, the FERC may have meant that the El Paso plan's "off-the-top" protection for the smallest pipeline customers combined with the ability of larger customers like the petitioners to "fend for themselves" by using the type of self-help strategies discussed above, *see supra* page 895, to protect the remaining high-priority users sufficed to shelter *all* high-priority users from curtailments. *Cf. State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866 (noting that courts will uphold decisions "of less than ideal clarity if the agency's path may reasonably be discerned") (internal quotation omitted). This inference gains some support from the fact that, after issuing the orders under review here, the FERC issued Order No. 636–A, in which it emphasized that, in the new competitive environment, self-help strategies were generally sufficient to assure protection of end-users and thus to meet NGA mandates. *See* Order No. 636–A, III FERC Statutes & Regulations, Regulations Preambles, ¶ 30,-950, at 30,590 (1992) ("The Commission believes that with deregulated wellhead sales and a growing menu of options for unbundled pipeline service, customers should rely on prudent planning, private contracts, and the marketplace to the maximum extent practicable to secure both their capacity and supply needs. In today's environment, LDC's [sic] and end-users no longer need to rely exclu-

sively on their traditional pipeline supplier. Rather, to an ever-increasing degree they rely on private contracts with gas sellers, storage providers, and others; a more diverse portfolio of pipeline suppliers, where possible; local self-help measures (*e.g.*, local production, peak shaving and storage), and their own gas supply planning. . . ."); *id.* ("[T]he Commission finds that neither the NGA nor the public interest require[s] that the Commission on an industry-wide basis today extend the end-use curtailment rules applicable to pipeline sales to interstate pipeline transportation . . . services.").

But even if the Commission did implicitly rely on reasoning akin to that in Order No. 636–A in the orders under review here, and even if it was reasonable for the Commission to conclude that 636–A self-help mechanisms normally protect high-priority end-users from capacity curtailments, the FERC has not explained its application of those principles to *this particular case* sufficiently to allow a reviewing court to find that it gave reasoned consideration to all the factors relevant to its decision. *See State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866; *Tejas*, 908 F.2d at 1003 (even if the Commission reasonably believed that gas inventory charges are in the public interest, it must relate the general benefits it foresees from such charges to the specific case before it). First, although the proposed El Paso plan distinguishes customers who receive special protection from those who do not based solely on their size, nowhere in these orders did the FERC explain why it found *size* to be a relevant, indeed a decisive, factor in its analysis of whether pipeline customers—even customers that serve high-priority users almost exclusively—could "fend for themselves" by using the Order No. 636–A mechanisms to protect end-users under a *pro rata* curtailment plan.[7] And, if size is crucial in determining the feasibility of self-help, why was the specific size-based distinction drawn in El Paso's plan a reasonable one? Again, the Commission offers no explanation. This last omission is especially troubling because, based on state-

---

7. We note that, in terms of the self-help strategies that the Commission has enumerated, it might well be reasonable to assume that, in general, larger pipeline customers, even those that serve mostly high-priority end-users, would be able to protect themselves more readily than

smaller customers. For example, larger customers might be able to take advantage of economies of scale in contracting for or building their own storage facilities. But of course our lay ruminations on this issue cannot substitute for explicit FERC reasoning.

ments made at oral argument, it appears that the fault line between pipeline customers who receive "off-the-top" service and those subject to *pro rata* curtailment is based on historical categories rather than a reasoned judgment about which customers could protect their high-priority end-users under *pro rata* curtailments and which could not.

In sum, to engage in reasoned decision-making, the FERC must explain (1) why the size of a transportation customer—even one that serves largely high-priority end-users—is relevant to its ability to protect those end-users under a *pro rata* curtailment plan and (2) why the specific size-based line drawn here was reasonable. *Cf. Maine Public Service Co. v. FERC*, 964 F.2d 5, 10–11 (D.C.Cir. 1992) (the FERC's statement that utilities in New England had engaged in a certain type of behavior was not sufficient explanation absent (1) discussion of the actions of the particular utility at issue and (2) why those specific actions justified the Commission's decision). Since it has done neither, we remand.

### CONCLUSION

Section 401 of the NGPA does not answer the precise issue of whether it covers capacity constraint curtailment plans for transportation service. In view of Congress' contemporaneous concern with supply shortages, the Commission has reasonably concluded that it does not. But the NGPA is not the sole source of statutory protection against curtailments. The Commission acknowledges that the NGA requires it to assure that high-priority end-users have continuous access to natural gas, but it has failed to provide an adequate explanation for its apparent conclusion that El Paso's "off-the-top" protection for a discrete group of its smallest customers suffices to protect all high-priority end-users served (indirectly) by El Paso. Accordingly, we deny the petition for review as to the Commission's decision on the NGPA issue, but remand for a better explanation of its position on the NGA issue.

*So ordered.*