**TEJAS POWER CORPORATION, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION.**

**Nos. 89–1267, et al.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 8, 1990.

Decided July 24, 1990.

---

Joseph C. Bell, with whom John M. Hopper, Jr., for Tejas Power Corp., Philip M. Marston and Robert Y. Hirasuna, for Hadson Gas Systems, Inc., and Frances McD. Kilborne, for Texaco, Inc., were on the joint brief, for petitioners Tejas Power Corp., et al., in 89–1267, 89–1294, 89–1310, and 89–1379, and intervenors in 89–1373 and 89–1392. Ralph J. Pearson, Jr., and David Lindberg, for Texaco, Inc., also entered appearances, for petitioners.

William H. Penniman, with whom Sterling H. Smith, for Process Gas Consumers Group and American Iron and Steel Institute, were on the joint brief, for petitioners Tejas Power Corp., et al., in 89–1379, and intervenors in 89–1267, 89–1294, 89–1310, 89–1373, and 89–1392.

Mark G. Magnuson for Consolidated Natural Gas Service Corp., Stephen E. Williams, Kevin J. Lipson, and Richard T. Saas, for CNG Transmission Corp., were on the joint brief, for petitioner CNG Transmission Corp., in 89–1392, and intervenor in 89–1267, 89–1294, 89–1310, 89–1373, and 89–1379. John E. Holtzinger, Jr., and Charles C. Thebaud, Jr., for CNG Transmission Corp., also entered appearances, for petitioner.

Dwight C. Alpern, attorney, F.E.R.C., for respondent. Jerome M. Feit and Jill Hall, attorneys, FERC, were on the brief, for respondent. Robert H. Solomon, atty., FERC, also entered an appearance, for respondent in all cases.

Henry S. May, Jr., with whom Judy M. Johnson, and Catherine O'Harra, for Texas Eastern Transmission Corp., John T. Miller Jr., for Elizabethtown Gas Co., Michael W. Hall and David Konick for Brooklyn Union Gas Co., Mary Baluss and Christopher J. Barr, for Philadelphia Elec. Co., Edward B. Myers, for Orange and Rockland Utilities, Inc., Stephen J. Small, for Columbia Gas Transmission Corp., Stanley W. Balis for Municipal Defense Group, Jerome C. Muys, for Somerset Gas Service, and Kevin J. Lipson, John E. Holtzinger, Jr., and Charles C. Thebaud, Jr., for CNG Transmission Corp., were on the joint brief, for intervenors in 89–1267, 89–1294, 89–1310,

89–1373, 89–1379, and 89–1392. Richard J. Kruse and J. Evans Attwell, for Texas Eastern Transmission Corp., William E. Mohler, III, and Giles D.H. Snyder, for Columbia Gas Transmission Corp., Demetrios G. Pulas, Jr., for Municipal Defense Group, Harry H. Voigt, M. Reamy Ancarrow, Diane B. Schrotwieser, and Mindy A. Buren, for Orange and Rockland Utilities, Inc., also entered appearances, for intervenors.

James R. Lacey, for Public Service Electric and Gas Company, Don S. Smith and Steven A. Weiler, for Associated Natural Gas Co., Richard A. Solomon and David D'Alessandro, for Public Service Com'n of the State of New York, James F. Bowe, Jr., and Julia Weller for Long Island Lighting Co., Gary E. Guy for Equitrans, Inc., Joseph M. Oliver, Jr., M. Lisanne Crowley, and Nicholas W. Mattia, Jr., for New Jersey Natural Gas Co., William I. Harkaway, Steven J. Kalish, and Barbara M. Gunther, for Consolidated Edison Co. of New York, Richard E. Powers, Jr., John K. McDonald, and John B. Chapman, for Pennzoil Co., Mary E. Baluss, for UGI Corp., John S. Schmid, Gearold L. Knowles, and Mark A. Gallagher, for Bay State Gas Co., et al., John W. Amos for Nashville Gas Co., et al., George L. Weber and Kenneth L. Glick for Nat. Fuel Gas Supply Corp., Charles H. Shoneman for Producer–Marketer Trans. Group, and Ronald E. Christian, for Indiana Gas Co., also entered appearances, for intervenors.

Before WILLIAMS, D.H. GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Over the past decade, the Federal Energy Regulatory Commission has taken a number of steps to make the market for the sale of natural gas more competitive. One such step has been to encourage pipeline companies to implement a gas inventory charge (GIC). As the Commission explained in a statement of policy made in the course of Order No. 500, *Regulation of Natural Gas Pipelines After Partial Wellhead Decontrol*, 52 Fed.Reg. 30,334 (1987), *record remanded on other grounds, American Gas Ass'n v. FERC*, 888 F.2d 136 (D.C.Cir.) (hereinafter *AGA I*), *on remand*, Order No. 500–H, 54 Fed. Reg. 52,344 (1989), *reh'g granted in part and denied in part*, Order No. 500–I, 55 Fed.Reg. 6605, *review pending, American Gas Ass'n v. FERC*, 888 F.2d 136 (D.C.Cir. 1990), the GIC is intended "[t]o enable pipelines to avoid the future recurrence of take-or-pay problems" by establishing a mechanism by which they "may file to recover the costs of maintaining supply for their customers." *Id.* at 30,346.

In *AGA I* we did not review a facial challenge to the Commission's policy statement on GICs because it was not ripe, in that form, for review. Review would be appropriate, we said, only when "the GIC policy precipitates a concrete case on a settled record." 888 F.2d at 152. In our first review of a Commission decision approving a particular GIC, we were again unable, for the most part, to reach the merits because the issues were rendered moot when both of the pipeline's customers declined to nominate service under the GIC. *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 574–76, 581–82 (1990).

Today we review on the merits the Commission's approval of the GIC proposed by Texas Eastern Transmission Corp. 44 FERC ¶ 61,413 (1988), *reh'g denied*, 47 FERC ¶ 61,100 (1989). This GIC departs, in some important respects, from the model envisioned in the Order No. 500 policy statement, and is seemingly at odds with other Commission decisions regarding GICs. The Commission approved it nonetheless, and defends it on a number of grounds, most prominently that all twelve of Texas Eastern's resale customers, which are local distribution companies (LDCs), agreed to its terms as part of a general settlement filed in response to the Commission's earlier decision to set Texas Eastern's GIC proposal for hearing.

We are unable to uphold the FERC's approval of this GIC because the Commission has failed to justify its heavy reliance

upon the LDCs' having agreed to its terms. We also conclude that the Commission has not adequately explained its approval of two particular features of the GIC.

## I. FACTS

In November 1987, Texas Eastern filed tariff sheets with the Commission proposing to implement open-access transportation, pursuant to Order No. 500, and a GIC to be paid by firm sales customers that execute new service agreements. The Commission accepted the open-access proposal subject to conditions; noting that the GIC would result in a "significant change in [Texas Eastern's] service relationship" with its customers, however, it severed that aspect of the filing and set it down for a hearing. *Texas Eastern Transmission Corp.*, 41 FERC ¶ 61,373, at 62,018 (1987). The Commission observed that the proposal was inconsistent with its Order No. 500 policy statement in a number of respects: it did not provide for customers freely to nominate their annual contract quantities (ACQs); it did not include a price cap or allow customers to change their level of service if Texas Eastern increased the GIC or the commodity rate; and it contained exculpatory language to the effect that the pipeline company did not guarantee its customers the gas supplies for which, presumably, they were to pay the GIC. Therefore, the Commission stated, it required a hearing in order to determine either that the proposed GIC was cost-based or that "market forces [could] be relied upon to maintain rates within the just and reasonable range." *Id.* at 62,019.

Texas Eastern and its wholesale customers then began settlement discussions, which culminated in their filing a joint offer of settlement in May 1988. The settlement, which is identical in most respects to Texas Eastern's original proposal, provides that customers may initially "specify new contract demand ["CD"] levels for firm sales service under Rate Schedules CD–1 and CD–2[,] reduce their contract demand levels to zero or convert some or all of that contract demand to firm transportation service." 44 FERC at 62,324. A customer

may also elect to stay with its existing service agreement, in which case it retains its rights, under Order No. 500, to open-access transportation and to partial CD conversion. A customer electing the new CD–1 service may later convert firm sales to firm transportation at a rate of up to 10 percent per year, subject to overall caps of 25 percent each during the first six and the next four years. Insofar as any customer does not exercise all of its conversion rights, Texas Eastern will offer those rights, *pro rata,* to other customers. A customer may, in addition, elect to receive standby sales service, which allows it, on a daily basis, to convert up to 50 percent of its firm sales entitlement to firm transportation.

Some aspects of Texas Eastern's GIC appear to be less favorable to customers than would be a GIC that conformed to the model of the policy statement in Order No. 500. For example, under the GIC, customers are not able, at least to the extent contemplated by the Commission in Order No. 500, "to nominate levels of service freely within their firm sales entitlements or otherwise employ a mechanism for the renegotiation of levels of service at regular intervals." Order No. 500, 52 Fed.Reg. at 30,346. In addition, because the GIC is in the form of a deficiency charge to be assessed against any customer that purchases less than 60 percent of its ACQ, which petitioners claim (for a reason we need not detail here) is equal to about 90 percent of its average annual contract demand, a customer is less likely to purchase gas from another supplier than it would be if its GIC were a fixed amount. As the Commission acknowledged, moreover, the "formula for calculating Texas Eastern's inventory charge, 20 percent of certain gas costs within Texas Eastern's PGA, is not a firm pricing formula within the meaning of section 2.105(c)"; this is less desirable from the customers' point of view because the "pipeline's gas costs are the direct result of its own purchasing practices and therefore cannot be considered wholly beyond its control." On the other hand, Texas Eastern may retain excess GIC payments for only five years, after which it must refund to

customers (through Account No. 191, the PGA balancing account) any amount that it has not used to settle take-or-pay obligations. Finally, the settlement contains the following clause:

> It is understood that the Seller does not now have, and in the absence of Seller's negligence, bad faith, fault or willful misconduct, may not have in the future sufficient gas supplies to supply Buyer with the quantities of gas specified in the Service Agreement for the term of such Agreement.

The Commission accepted the settlement in its entirety, without conducting a hearing. In so doing, it rejected the argument by Citizens Gas Supply Corp., which competes with Texas Eastern for sales business, that the settlement forecloses competition in a significant part of Texas Eastern's market; in the Commission's view, customers retained "sufficient flexibility to obtain alternative supplies," received a number of benefits, and most important, voluntarily agreed to the proposal. It also rejected various parties' contention that the customers agreed to the settlement only because they lacked any viable alternative; it found that the customers "would have substantial supply alternatives in the absence of the settlement" and that "many of Texas Eastern's customers are powerful economic entities and are not easily manipulated under any circumstances."

At the same time, however, the Commission declined to resolve the claim, advanced by Citizens and others, "that Texas Eastern's tariff sheets offering firm transportation and storage services are not substantially comparable to the transportation and storage services provided in connection with Texas Eastern's firm sales service." Instead, the Commission stated that it would resolve the comparability issue in a separate proceeding and that, because the LDCs had agreed to the settlement, that proceeding did not have to run its course before the GIC could be approved.

The Commission expressly recognized that the settlement differs in many respects from the guidelines for GICs in Order No. 500, but noted that the Order is only a statement of policy, not a binding regulation, insofar as it concerns GICs. Moreover, the Commission concluded that the differences were acceptable because this GIC "is part of a larger settlement and all of Texas Eastern's customers have voluntarily agreed to it and no state commission has opposed the settlement." The Commission likewise accepted the exculpatory clause on the grounds that the customers had agreed to it, and that it "does not necessarily absolve Texas Eastern from liability in the event of a supply shortfall[, but] only recognizes that a shortfall is possible even if Texas Eastern is not guilty of negligence, etc."

The Commission also distinguished this GIC from a minimum bill, which it had prohibited as anticompetitive in Order No. 380; minimum bills, it explained

> were not designed solely to compensate [pipelines] for costs incurred to buy out and buy down gas supply contracts or to settle prepayment obligations, and they did not provide for refunds in excess of those costs, as proposed in the instant settlement. [In addition], Texas Eastern's customers had no choice as to whether they would be subject to a minimum bill.

The Commission also noted *obiter* that "Texas Eastern's proposed deficiency-based inventory charge is substantially lower than the minimum commodity bills rejected by Order No. 380."

## II. ANALYSIS

At bottom the Commission approved Texas Eastern's GIC because all of the pipeline's resale customers, which are LDCs, agreed to it and no state public service commission opposed it. Even if we assume, however, that the Commission was correct in its view that the LDCs were not, when they entered into the settlement, facing a pipeline with significant market power, the Commission failed to justify the extent to which it relied upon the LDCs' agreement in determining where the public interest lies. Relaxing that assumption, we see that the Commission did not, in fact, have before it any basis for its statement

that, absent the settlement, the LDCs "would have substantial supply alternatives." The Commission also failed adequately to justify its approval of two specific aspects of the settlement: the exculpatory clause and the refund mechanism.

### A. *Reliance Upon the LDCs' Agreement*

■ The Commission was clearly justified in according some weight to the LDCs' having agreed to the settlement. *See Mobil Oil Corp. v. FPC*, 417 U.S. 283, 312–14, 94 S.Ct. 2328, 2347–49, 41 L.Ed.2d 72 (1974). Indeed, since the Supreme Court's decisions in *United Gas Pipe Line Co. v. Mobil Gas Serv. Corp.*, 350 U.S. 332, 76 S.Ct. 373, 100 L.Ed. 373 (1956), and *FPC v. Sierra Pacific Power Co.*, 350 U.S. 348, 76 S.Ct. 368, 100 L.Ed. 388 (1956), this court has consistently required the Commission to give weight to the contracts and settlements of the parties before it. *See, e.g., Union Elec. Co. v. FERC*, 890 F.2d 1193, 1194–95 (1989).

At the same time, the Commission may approve the settlement and certificate the proposed service only if, in its independent judgment, the new service "is or will be required by the present or future public convenience and necessity." Natural Gas Act § 7(e), 15 U.S.C. § 717f(e); *see also* 18 C.F.R. § 385.602(g)(3) (Commission may approve uncontested settlement only "upon a finding that the settlement appears to be fair and reasonable and in the public interest"). In other words, that the proposal is a settlement does not "establish without more the justness and reasonableness of its terms." *Mobil Oil*, 417 U.S. at 312–13, 94 S.Ct. at 2347–48; *ANR Pipeline Co. v. FERC*, 771 F.2d 507, 519 (D.C.Cir.1985). Further, the Commission's own rules provide that it may approve a contested settlement, such as this one, only if "the record contains substantial evidence upon which to base a reasoned decision or [if it] determines there is no genuine issue of material fact." 18 C.F.R. § 385.602(h)(1)(i).

First, therefore, the Commission's approval of this settlement cannot be upheld if only because the agency failed expressly to determine whether the GIC serves the public interest. While the Commission may be able to infer from the LDCs' agreement that their interests are served, the public interest that the Commission must protect always includes the interest of consumers in having access to an adequate supply of gas at a reasonable price. *See, e.g., FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 610, 64 S.Ct. 281, 291, 88 L.Ed. 333 (1944) ("The primary aim of [the NGA] was to protect consumers against exploitation at the hands of natural gas companies."); *cf. FPC v. Texaco Inc.*, 417 U.S. 380, 397–401, 94 S.Ct. 2315, 2326–28, 41 L.Ed.2d 141 (1974).

The Commission clearly enough believes that a GIC is usually in the public interest. For example, in approving Texas Eastern's GIC, it noted that an "inventory charge generally facilitates rational market activity," promotes the "goal of substantial competition in the natural gas industry," and may prevent the recurrence of a pipeline's take-or-pay problems. The Commission failed, however, to relate these benefits to the GIC before it, which cannot be equated with the generic GIC of Order No. 500 just because it is called a GIC by its promoter. Even more pointedly, the Commission made no effort to look beyond the benefits that it foresees for the pipeline and its LDC customers in order to determine whether any benefits or harm might accrue to the LDCs' downstream consumers who, presumably, will bear the cost of the GIC. The silence of the relevant state commissions is not significant in this regard, since various end users contested the settlement on their own behalf. Their challenge triggers the Commission's obligation, under § 7 of the NGA and § 385.602(h)(1)(i) of its rules, to examine the potential impact of the GIC upon their interests and to support its conclusions with substantial evidence.

Second, neither the Commission nor we may merely assume, without analysis, that the LDCs' protection of their own interests (if indeed they were able to protect them) will inure to the benefit of consumers; as regulated utilities, the LDCs might not have a sufficient incentive, in dealing with the pipeline, to minimize their costs. Commissioner Stalon noted in his dissent from the approval of this GIC, for example, that

"the consenting parties ... are a group of monopolists negotiating a deal which transfers all risk associated with the [GIC] downstream to the end-user." Without endorsing that or any other view of the merits, we hold that the Commission must, at a minimum, address the question of whether the LDCs' interests are sufficiently likely to be congruent with those of ultimate consumers that it may rely upon the LDCs' agreement as dispositive of the consumers' interests, notwithstanding the claim of some large and sophisticated consumers to the contrary. In doing so, it should consider, in particular, the role of the States in ensuring that, when an LDC attempts to recover from ratepayers the cost that it incurs pursuant to this GIC, its customers are not saddled with unwarranted expenses that the LDC may have had little incentive to avoid. *Compare, e.g., Nantahala Power & Light Co. v. Thornburg,* 476 U.S. 953, 970, 106 S.Ct. 2349, 2358–59, 90 L.Ed.2d 943 (1986) (filed rate doctrine bars State from preventing seller of power "from recovering the costs of paying [a] FERC-approved rate") *with id.* at 972, 106 S.Ct. at 2360 (leaving undecided whether State may evaluate reasonableness of seller's decision to purchase "a particular *quantity* of power ... from a particular source").

Third, the approval of the settlement in this case is particularly troublesome because the Commission made no prior finding that Texas Eastern lacks significant market power vis-a-vis the LDCs. In a competitive market, where neither buyer nor seller has significant market power, it is rational to assume that the terms of their voluntary exchange are reasonable, and specifically to infer that price is close to marginal cost, such that the seller makes only a normal return on its investment. In this instance, however, the Commission in essence assumed, because the LDCs had agreed to it, that the terms of the settlement—both price and non-price—were reasonable, without first determining, upon the basis of substantial evidence, that the pipeline lacks significant market power.

To be sure, the Commission stated:
There is reason to believe that Texas Eastern's customers were in a strong negotiating position when they agreed to the settlement. These customers would have substantial supply alternatives in the absence of the settlement because Texas Eastern's choice to provide [open-access transportation] was not a condition of the settlement.

Recall, however, that the Commission decided to postpone until after it approved this settlement a hearing on whether "Texas Eastern's tariff sheets offering firm transportation and storage services are ... substantially comparable to the transportation and storage services provided in connection with Texas Eastern's firm sales service." The Commission points to nothing in the record (we disregard the nicely colored but unexplained maps appended to its brief) to suggest that none of Texas Eastern's LDC customers is dependent upon the transportation and storage services that Texas Eastern offers. Without having first assessed the comparability of Texas Eastern's unbundled transportation and storage services, therefore, the Commission could not rationally conclude that the LDCs could take advantage of any alternative sources of gas.

The Commission attempts to justify its decision by pointing to the LDCs' willingness to agree to the settlement without its having first found that Texas Eastern's unbundled services are comparable to the transportation and storage components of Texas Eastern's existing delivered gas service. This is not entirely logical: if the pipeline has significant market power with which to extract an agreement unfavorable to its LDC customers, then it would not require much imagination for the pipeline also to require that they support the agreement fully before the Commission. In any event, quite apart from whether the settlement is unfavorable to the LDCs, the Commission may not be complacent about the possibility that the GIC is so structured as to enable the pipeline, through the exercise of significant market power, to impose unreasonable terms that will likely be paid for by end users that were not parties to the settlement.

Nor is there substantial evidence upon the basis of which the Commission could conclude that market forces will keep Texas Eastern's prices in reasonable check. It is not clear that even the Commission has concluded that there is such evidence: in its brief, it states that its own prior decisions requiring a finding of comparable service before approving a "market based" GIC "are clearly distinguishable from the case here [because] Texas Eastern's [GIC] is cost based" rather than market based, by which we understand it to mean that the net amount of the GIC, after refunds, will reflect the pipeline's take-or-pay buyout and buydown costs, rather than the constraints of market competition. In any event, were the Commission asserting that the GIC is market based, we could not uphold it. The only reason it gave for not requiring a comparability hearing before approving the GIC is that the LDCs are willing to accept the settlement without awaiting the verdict on that score; as discussed above, however, relying upon the LDCs' agreement begs the question whether the agreement is the product of the pipeline's exercise of significant market power, a question made salient by the possibility that, as utilities subject to cost-based price regulation, the LDCs might with reason assume that they can recover from end users any costs they incur under this settlement.

## B. *The Exculpatory Clause*

■ The Commission has not adequately justified its acceptance of the "exculpatory clause" of the settlement, which we set out above. The Commission's remark that the clause "does not necessarily absolve Texas Eastern from liability," unaccompanied by any explanation, is cryptic; the clause undoubtedly means something, and it may mean that the LDCs are not guaranteed the supply of gas for which they are supposedly paying (with ratepayers' money) the GIC. It might be reasonable for the Commission to conclude that the LDCs may agree, as part of a larger settlement, to give up some degree of assurance that they will receive the gas for which they have contracted—at least if the Commission has

first found that the pipeline does not have significant market power. The Commission must, however, discharge its obligation to the public by assuring itself, in a manner intelligible to a reviewing court, that end users will not be unduly harmed by the exculpatory clause.

## C. *The Refund Mechanism*

■ The Commission has also failed adequately to explain its approval of the refund mechanism, which requires Texas Eastern, after five years, to distribute unused GIC funds *pro rata* to then-present customers through Account No. 191, rather than directly to the customers that made the payments. FERC has, in several other recent proceedings before this court, attached much importance to its policy of matching cost incurrence and cost causation wherever feasible. *See, e.g.*, Brief for the FERC at 49–51, *Associated Gas Distribs. v. FERC*, 893 F.2d 349 (D.C.Cir.1989) (No. 88–1385). Yet the Commission has failed persuasively either to reconcile that policy with the refund mechanism here, or to acknowledge a departure from the policy and give a reason therefor. It states only that "[r]efunding excess amounts to all sales customers through the PGA is equitable since all sales relieve take-or-pay obligations." This statement does not respond to the matching policy, however, because a customer need not, in order to receive a "refund," have made any GIC payment; indeed, it need not have been on Texas Eastern's system during the preceding five years, in which case it was other customers' purchases that enabled Texas Eastern to avoid incurring take-or-pay costs. Similarly, a customer that made GIC payments to Texas Eastern and purchased its entire ACQ for five years would receive no refund if it stopped purchasing from Texas Eastern on the day before the refunds were allocated. On remand, therefore, the Commission must reconsider its acceptance of this particular refund mechanism in light of its general policy of matching cost incurrence to cost causation.

### III. Conclusion

We do not hold that the Commission cannot approve any of the terms of this settlement, only that it has so far failed adequately to justify its doing so. The Commission's reliance upon the LDCs' agreement is misplaced in the absence of a showing that their markets are so structured that they have adequate incentives to keep costs down—as might be the case if a significant proportion of their customers had access to competitively priced gas and local regulations were designed to prevent them from shifting an undue share of costs to captive customers. Its reliance upon the absence of significant pipeline market power is unsupported by substantial evidence. And to the extent that the Commission relied upon the cost-based character of the GIC, it did not independently determine, *i.e.* apart from the LDCs' having agreed to it, that the settlement is just and reasonable. Moreover, even if the GIC is cost based, the Commission must account for the exculpatory clause and for the departure of the refund provision from the Commission's cost-matching policy before it can approve the settlement under the public convenience and necessity standard. The matter is therefore remanded for the Commission's further consideration.

*So ordered.*