Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued May 6, 2003        Decided August 12, 2003

No. 02-1132

MISSOURI PUBLIC SERVICE COMMISSION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ENBRIDGE PIPELINES, ET AL.,
INTERVENORS

On Petition for Review of an Order of the
Federal Energy Regulatory Commission

*John E. McCaffrey* argued the cause for petitioner. With him on the brief was *David W. D'Alessandro*. *Kelly A. Daly* entered an appearance.

*Lona T. Perry*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

the brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Deputy Solicitor.

*James P. White* and *William A. Williams* were on the brief for intervenor Enbridge Pipelines.

Before: EDWARDS, SENTELLE, and GARLAND, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*: For the second time, petitioner Missouri Public Service Commission seeks review of initial rates approved by the Federal Energy Regulatory Commission (FERC) for natural gas transportation by the Kansas Pipeline Company. On the last occasion, we rejected as arbitrary and capricious the reasons FERC gave for approving the challenged rates. On remand, the Commission reaffirmed the same rates, albeit emphasizing different rationales. We once again find FERC's reasoning arbitrary and capricious. Accordingly, we vacate its orders and remand the case for further proceedings consistent with this opinion.

I

The lengthy and complex procedural history of this case is explained in detail in the FERC orders under review, and in our previous opinion, *Missouri Public Service Commission v. FERC*, 234 F.3d 36 (D.C. Cir. 2000) [hereinafter *Missouri I*]. We provide only a brief summary here.

The Natural Gas Act (NGA) grants FERC jurisdiction over the transportation of natural gas in interstate commerce. 15 U.S.C. § 717(b); *see also* 42 U.S.C. § 7172(a)(1)(C). Section 7 of the NGA bars the "transportation or sale of natural gas[ ] subject to the jurisdiction of [FERC]," except under a "certificate of public convenience and necessity issued by the Commission." 15 U.S.C. § 717f(c)(1)(A). The section further gives the Commission the "power to attach to the ... certificate ... such reasonable terms and conditions as the public convenience and necessity may require." *Id.* § 717f(e). Under that authority, FERC employs a "public interest" standard to determine the initial rates that a pipeline may charge for newly certificated service. *See Atlantic Refining Co. v.*

*Public Serv. Comm'n*, 360 U.S. 378, 391 (1959). Those initial rates "offer a temporary mechanism to protect the public interest until the regular rate setting provisions" of § 4 of the NGA, 15 U.S.C. § 717c, come into play. *Algonquin Gas Transmission Co. v. Federal Power Comm'n*, 534 F.2d 952, 956 (D.C. Cir. 1976); *see Atlantic Refining*, 360 U.S. at 391–92. Section 4 requires rates to be "just and reasonable," 15 U.S.C. § 717c, rather than merely in the "public interest" as required by § 7. *See Atlantic Refining*, 360 U.S. at 390–91.

In 1995, FERC determined that three affiliated and interconnected natural gas pipelines of the Kansas Pipeline Company system (KPC or "Kansas Pipeline") constituted a single interstate pipeline system subject to FERC jurisdiction under the NGA. *KansOk P'ship*, 73 F.E.R.C. ¶ 61,160 (1995). The Commission ordered KPC to file an application for § 7 certification to operate the pipeline system and transport gas in interstate commerce. In 1998, FERC approved KPC's existing contractual rates (the "Motion Rates") as the pipeline's initial rates for service under NGA § 7, pending completion of a rate case under NGA § 4 to determine just and reasonable rates. *See Kansas Pipeline Co.*, 83 F.E.R.C. ¶ 61,107 (1998) [hereinafter 1998 Order]. The Missouri Public Service Commission ("Missouri PSC") — a Missouri agency with jurisdiction to regulate rates and charges for the sale of natural gas to consumers within the State of Missouri — sought rehearing. FERC denied the rehearing request, reaffirming its approval of the existing rates. *See Kansas Pipeline Co.*, 87 F.E.R.C. ¶ 61,020 (1999) [hereinafter 1999 Rehearing Order].

In *Missouri I*, we reviewed the 1998 Order and 1999 Rehearing Order. Counsel for FERC defended the orders' approval of the existing rates on five grounds, arguing that: (1) approval of the existing rates ended the dispute over whether the pipeline was properly subject to FERC's interstate jurisdiction; (2) the existing rates had been negotiated among the parties; (3) the existing rates had been approved by KPC's prior state regulator; (4) the existing rates preserved KPC's financial integrity and prevented KPC's bankruptcy; and (5) the existing rates were lower than the rates FERC would otherwise have approved on rehearing (the

"Rehearing Rates"). *See Missouri I*, 234 F.3d at 40. We found that the second and third rationales (that the existing rates had been negotiated by the parties and had been approved by KPC's prior regulator) could not sustain FERC's determination because FERC had not actually relied on those grounds in its orders. *Id.* at 41 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). We further held that, although FERC had mentioned the first and fourth rationales (that approval of the rates would end the jurisdictional dispute and would preserve KPC's financial integrity), it had done so only in a "passing reference" that was "not sufficient to satisfy the Commission's obligation to carry out 'reasoned' and 'principled' decisionmaking." *Id.*

That left only the fifth rationale, which we regarded as the Commission's "primary reason" for approving the existing rates: the argument that those rates were lower than the rates that FERC would otherwise have approved had it granted a rehearing. *Id.* at 42. We rejected that rationale as well, finding that the Commission had not even attempted to defend its computation of the rates it would otherwise have approved — a fact that made it impossible for us to accept the use of those rates as a benchmark for comparing the existing rates. *Id.* Ruling that "FERC ha[d] not adequately explained how the rationales, alone or together, satisfy the 'public interest' standard of section 7," we remanded to the agency for further proceedings. *Id.* We noted, however, that with proper support, some of the rationales found wanting in *Missouri I* might serve as justifications for § 7 rates in an appropriate case. *Id.*

On remand, the Commission reaffirmed the rates that it had initially approved in its 1998 Order. *See Kansas Pipeline Co.*, 97 F.E.R.C. ¶ 61,168 (2001) [hereinafter 2001 Remand Order]. In so doing, FERC abandoned the primary justification it had offered in *Missouri I* and turned to an array of other rationales. 2001 Remand Order, 97 F.E.R.C. at 61,779, 61,784–85. Missouri PSC sought rehearing, which FERC denied in 2002. *See Kansas Pipeline Co.*, 98 F.E.R.C. ¶ 61,343, at 62,457 (2002) [hereinafter 2002 Rehearing Order]. The 2002 Rehearing Order clarified the Commission's reason-

ing, listing three supporting rationales. According to the Commission, approval of the existing rates: (1) preserved KPC's financial integrity, by ensuring compliance with a condition of a major loan agreement; (2) was fair to KPC's shippers because those rates had been negotiated by the shippers and approved under the prior state regulatory regime; and (3) would resolve the jurisdictional issue, because KPC had agreed to drop its challenge to FERC's jurisdiction if the existing rates were adopted. *See* 2002 Rehearing Order, 98 F.E.R.C. at 62,457.

Missouri PSC filed a timely petition for review, and Enbridge Pipelines, the successor to KPC, intervened in support of FERC's decision. In the meantime, FERC has completed § 4 proceedings for the pipeline, and the § 4 rates — which are substantially lower than the rates that FERC approved under § 7 — have gone into effect. Our decision in this case, therefore, will have no prospective effect; it will determine only whether KPC's customers were overcharged and whether FERC should consider a refund for the rates assessed during the interim period.

## II

We review FERC's orders under the arbitrary or capricious standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *Missouri I*, 234 F.3d at 40.[1] To satisfy that

---

[1] We reject at the outset Enbridge Pipeline's contention that we are without jurisdiction to consider Missouri PSC's argument that FERC erred in "depart[ing] from cost-based ratemaking policies," because the petitioner failed "to urge the issue" adequately in its request for rehearing before the Commission. Intervenor's Br. at 8; *see* 15 U.S.C. § 717r(b) ("No objection . . . shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do."). Examination of petitioner's application for rehearing makes clear that it did adequately raise the issue. *See, e.g.*, Joint Req. for Reh'g, at 1 (Dec. 10, 2001) (J.A. at 1125) (protesting the Commission's "extraordinary" departure "from its cost-based ratemaking policies"); *id.* at 2 (J.A. at 1126)

standard, there must be "a rational connection between the facts found and the choice made" by the Commission. *Id.* (internal quotation marks omitted). FERC must "articulate the critical facts upon which it relies," and when it "finds it necessary to make predictions or extrapolations from the record, it must fully explain the assumptions it relied on to resolve unknowns and the public policies behind those assumptions." *Id.* (quoting *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578, 593 (D.C. Cir. 1979)). Similarly, when "the Commission balances competing interests in arriving at its decision, it must explain on the record the policies which guide it." *Id.* (quoting *Columbia Gas*, 628 F.2d at 593). Finally, the Commission's factual findings are "conclusive" if, but only if, they are "supported by substantial evidence" in the record. NGA § 19(b), 15 U.S.C. § 717r(b).

There is no dispute that the "public interest" standard of NGA § 7 is less exacting than the "just and reasonable" requirement of § 4. *See Atlantic Refining*, 360 U.S. at 390–91. But both the Supreme Court and this circuit have made clear that the Commission has a duty to use its § 7 power to protect consumers. *See id.* ("[T]he inordinate delay . . . in the processing of § 5 proceedings requires a most careful scrutiny and responsible reaction to initial price proposals of producers under § 7."); *Consumer Fed'n of Am. v. Federal Power Comm'n*, 515 F.2d 347, 356 (D.C. Cir. 1975) (declaring that "preservation of the statutory scheme depends on diligent enforcement of the § 7 certification requirement as a holding operation on initial rates"). Indeed, the Commission's "usual practice in Section 7 certificate proceedings" is to "apply[ ], to the extent practicable, the same ratemaking policies that it applies in Section 4 rate cases in determining just and reasonable rates on a cost of service basis." 2001 Remand Order, 97 F.E.R.C. at 61,785; *see Maritimes & Northeast Pipeline, L.L.C.*, 84 F.E.R.C. ¶ 61,130, at 61,683 (1998).

---

(arguing that "[n]one of [FERC's arguments] . . . justify the Commission's admitted departure" from these policies).

FERC correctly noted that " 'non-cost' public interest factors may justify the Commission's departure from its usual cost-based approach to setting rates." 2001 Remand Order, 97 F.E.R.C. at 61,786–87 (citing *FERC v. Pennzoil Prods. Co.*, 439 U.S. 508, 517–18 (1979)). "The mere invocation of a non-cost factor, however, does not alleviate a reviewing court of its duty to assure itself that the Commission has given reasoned consideration to each of the pertinent factors." *Farmers Union Cent. Exch., Inc. v. FERC*, 734 F.2d 1486, 1502 (D.C. Cir. 1984) (citing *Pennzoil*, 439 U.S. at 518). "On the contrary," deviations from the Commission's customary cost-based approach, like departures from any agency's usual policy, must be "found not to be unreasonable and to be consistent with the Commission's . . . responsibility." *Id*. In short, FERC "must specify the nature of the relevant non-cost factor and offer a reasoned explanation of how the factor justifies the resulting rates." *Id.*

Missouri PSC contends, and FERC does not dispute, that in this case the Commission did depart from its customary practice of basing § 7 rates on cost-based principles. *See* Petitioner's Br. at 25; 2001 Remand Order, 97 F.E.R.C. at 61,784–85. The Commission argues that it did so, however, because KPC's pipeline presented "unique circumstances": unlike the pipelines in typical § 7 cases, "the Kansas Pipeline [was] neither a [newly constructed] pipeline, nor an existing company operating under a FERC-regulated tariff." 2002 Rehearing Order, 98 F.E.R.C. at 62,456. According to FERC, the three rationales set forth in its 2002 Rehearing Order respond to these unique circumstances and justify its decision to grandfather KPC's existing rates rather than adhere to its usual cost-based ratemaking principles. *Id.* at 62,457.

We consider the first two of FERC's rationales below. Because we find them insufficient to sustain FERC's orders, we have no reason to consider the third — that approval of the existing rates would resolve the dispute over FERC's jurisdiction. The Commission made clear that it "would not

have approved the [existing] rates simply to resolve the jurisdictional issue," 2002 Rehearing Order, 98 F.E.R.C. at 62,460, and as a consequence we may not affirm the agency's orders on that basis, *see SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 93–95 (1943).

## III

In its post-*Missouri I* orders, FERC's primary rationale for concluding that the existing rates were in the public interest was that they preserved KPC's financial integrity by ensuring compliance with a condition of a major loan agreement. The loan in question was a $91 million loan obtained by KPC's affiliate, Syenergy Pipeline Company (the "Syenergy loan"). *See* 2001 Remand Order, 97 F.E.R.C. at 61,788. The loan agreement contained a covenant requiring KPC to maintain a minimum Debt Service Coverage Ratio (DSCR) of 1.00 to 1.15.[2] *See id.* at 61,785. According to FERC, the approved rates were necessary to ensure KPC sufficient revenues to maintain the DSCR "with a reasonable margin of safety." *Id.* at 61,789.

For the two reasons discussed below, we conclude that this was an arbitrary and capricious rationale for approving KPC's existing rates under NGA § 7.

## A

The Commission first addressed the Syenergy loan in 1998, when it was considering KPC's initial request for interim rates under § 7. At that time, FERC flatly rejected KPC's argument that it should approve rates sufficient to cover the debt service on the loan. FERC's conclusion was set forth in harshly worded language, which we quote at length because of its importance to the present case:

---

[2] "The DSCR is calculated by dividing the loan applicant's net operating income by its total debt service obligations, including principal and interest, on all loans on the property serving as security." 2001 Remand Order, 97 F.E.R.C. at 61,785 n.37.

First, we can find no nexus between the value of the facilities and the size of the Syenergy primary loan. . . . [W]e can find nothing in the record to account for how the $91 million was actually used. Further, . . . the main purpose of the loan was to allow Syenergy to purchase 99.9 percent of the pipeline interests of Kansas Pipeline Partnership, KansOk, and Riverside. Since Syenergy [and the other three] ultimately are owned by the same entity, it would appear that this transaction is not at arms-length. *In essence, the company borrowed $91 million to purchase itself, at a price which it set, with no apparent nexus between the value of the facilities and the amount of the loan.* The argument put forth now is that the rate base should be raised artificially, and rates set accordingly, so that the applicant can make payments on the primary loan. Absent a nexus between the loan amount and the value of the facilities, and given the lack of arms-length negotiations due to the affiliate nature of those involved, we are not persuaded by the argument that, because of the [Kansas Corporation Commission] accounting order, we are required by law to ensure that the rates are sufficient to sustain the loan provisions.

1998 Order, 83 F.E.R.C. at 61,507 (emphasis added; footnote omitted). The Commission's refusal to rest its 1998 approval of KPC's rates on the rationale that they were necessary to satisfy the Syenergy loan — which had "no nexus" to the value of the facilities used to provide service to the ratepayers — was completely consistent with FERC's usual cost-based approach to ratesetting.[3]

---

[3] *Cf. K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300–01 (D.C. Cir. 1992) (noting that "it has been traditionally required that all approved rates reflect to some degree the costs actually caused by the customer who must pay them"); *Alabama Elec. Coop., Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982) (noting that "[p]roperly designed rates should produce revenues from each class of customers which match, as closely as practicable, the costs to serve each class or individual customer"); *Tennessee Gas Pipeline Co. v. FERC*, 606 F.2d 1094, 1109 (D.C. Cir. 1979) (stating that "current

But after *Missouri I* rejected the rationale upon which FERC did rest its 1998 Order, FERC reversed course and adopted the Syenergy loan's DSCR provision as the primary basis for its 2001 Remand Order. No new facts prompted the Commission's change of heart. To the contrary, in its request for rehearing, Missouri PSC submitted a spreadsheet *prepared by KPC* that demonstrated not just the absence of a nexus between the loan proceeds and the jurisdictional facilities, but that more than $7 million of the proceeds was used to pay stockholder and partnership distributions, and that over $3 million was wholly unaccounted for. *See* Joint Req. for Reh'g, attach. A (J.A. at 1158–59). Nor did the Commission suggest that its reversal was due to a reevaluation of any previously considered facts. Although FERC acknowledged its earlier concerns,[4] it concluded that "[r]egardless of the issues surrounding the underlying loan obligation, the loan was a legally binding obligation containing a condition which, if not met, would cause certain default." *Id.* at 61,788–89.

The first part of this explanation, that "the loan was a legally binding obligation," can hardly be sufficient. The point of FERC's cost-based ratemaking policy is that pipeline expenditures that do not benefit a pipeline's customers — whether or not the expenditures are legally binding — normally should not be the basis of the rates those customers pay. Otherwise, a pipeline could embark upon a perfectly legal and economically prudent diversification program into non-pipeline businesses, and bill the pipeline's customers for the cost of those investments. Or, as here, a pipeline could borrow money in order to make cash distributions to its

rate payers should bear only legitimate costs of providing service to them").

[4] *See* 2001 Remand Order, 97 F.E.R.C. at 61,788 ("It is true that the April 1998 Order in this proceeding found that Kansas Pipeline's loan commitments did not appear to be the product of transactions conducted at arms' length, since they involved affiliates, and the loan was greater than the net depreciated value of the pipeline facilities of the three pipelines found to constitute Kansas Pipeline's jurisdictional interstate system.").

partners, and recover the cost of those payments from shippers and consumers.

Nor was it sufficient that the DSCR condition, "if not met, would cause certain default," because mere default — without subsequent action by the lender — could well have no consequence. Acknowledging this point, FERC further elaborated by stating: "In that situation the lender *could* foreclose on Kansas Pipeline's pipeline facilities, since the Kansas commission had approved the lender's placement of a lien on those assets. Kansas Pipeline, therefore, *could* be forced into bankrupty and *potentially* out of business." *Id.* at 61,789 (emphasis added). But the number of qualifiers in this theoretical chain of events renders it a weak rationale for the imposition of the existing rates. When FERC "finds it necessary to make predictions or extrapolations from the record, it must fully explain the assumptions it relied on to resolve unknowns and the public policies behind those assumptions." *Missouri I*, 234 F.3d at 40 (quoting *Columbia Gas*, 628 F.2d at 593). It has not done so here.

The first link in the chain, FERC's concern that default "could" lead to foreclosure, was unaccompanied by any suggestion that foreclosure was likely. To the contrary, the "Commission recognize[d]" — just as it did in rejecting reliance on the Syenergy loan in 1998 — "that, since long term interest rates were in the 6 percent range when the April 1998 Order approved Kansas Pipeline's motion rates, the 9.5 percent loan secured by Kansas Pipeline's facilities would not necessarily be recalled by the holder simply because Kansas Pipeline's DSCR dipped below the loan['s] . . . DSCR default provision." 2001 Remand Order, 97 F.E.R.C. at 61,789; *see* 1998 Order, 83 F.E.R.C. at 61,507 n.18. Although this interest rate differential was a strong reason for concluding that violation of the DSCR alone likely would not lead to foreclosure, FERC dismissed the point with the statement that "there was no assurance that financial market conditions would not change." 2001 Remand Order, 97 F.E.R.C. at 61,789. But the truism that market conditions may change in the future does not give the Commission a license to ignore the present — at least not without some

assessment of the likelihood that such a change will occur. Moreover, FERC's 2001 decision to discount the effect of the interest rate differential on the lender's likely reaction was an unexplained reversal of its reliance on precisely that differential in refusing to rest the 1998 Order on the Syenergy loan. *See* 1998 Order, 83 F.E.R.C. at 61,507 n.18. This unexplained reversal was itself arbitrary and capricious. *See Baton Rouge Marine Contractors, Inc. v. Federal Mar. Comm'n*, 655 F.2d 1210, 1214–15 (D.C. Cir. 1981).

The second link in FERC's chain, that foreclosure could lead to forced bankruptcy, was equally speculative. The most the Commission could say was that "the potential . . . clearly existed." 2002 Rehearing Order, 98 F.E.R.C. at 62,456. And the third link, that bankruptcy could put the pipeline out of business, was similarly unaccompanied by any measure of its likelihood. Indeed, FERC acknowledged that "a reorganization in bankruptcy could have been beneficial for Kansas Pipeline and its customers," *id.*, but never explained how it balanced that potentially positive outcome against the negative possibilities upon which it relied.

The analytical weakness of FERC's orders is made manifest by contrasting them to the principal precedent upon which the Commission relied. In *Jersey Central Power & Light Co. v. FERC*, 810 F.2d 1168 (D.C. Cir. 1987) (en banc), this court vacated a FERC order that required an electric utility (Jersey Central) to file reduced rates based on the Commission's decision that the unamortized portion of the utility's unproductive investment in a nuclear generating station should be excluded from the rate base.[5] Unlike KPC's Syenergy loan, however, Jersey Central's investment in the generating station was concededly "prudent when made," as an effort to meet the projected needs of the utility's customers. *Id.* at 1171; *see also id.* at 1181. Also in contrast to this case, in which the parties cite no record evidence of the

---

[5] *Jersey Central* was decided under the "just and reasonable" standard of § 205 of the Federal Power Act, 16 U.S.C. § 824d, a provision analogous to NGA § 4. *See Jersey Central*, 810 F.2d at 1175.

likelihood of KPC's financial ruin, Jersey Central had submitted substantial evidence of its financial fragility and of the fact that the requested rates were the minimum "necessary to preserve [the] company's . . . financial integrity." *Id.* at 1172.[6]

We agree with the Commission that it was obligated "to consider the impact the initial rates would have on Kansas Pipeline's financial integrity." 2002 Rehearing Order, 98 F.E.R.C. at 62,458. *See generally Federal Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944); *Jersey Central*, 810 F.2d at 1177–78, 1182. But FERC's orders cite no evidence regarding the effect a default on the DSCR provision would have on the pipeline's financial integrity. And they are equally devoid of any indication that the Commission balanced that factor against the costs of requiring customers to pay rates to cover a loan, the size of which bears no nexus to the value of the facilities that benefit those customers. Accordingly, we find FERC's determination to be both arbitrary and unsupported by substantial evidence. *See Missouri I*, 234 F.2d at 42 ("In reviewing a rate order courts must determine whether or not the end result of that order constitutes a reasonable balancing, based on factual findings, of the investor interest in maintaining financial integrity and access to capital markets and the consumer interest in being charged non-exploitative rates." (quoting *Jersey Central*, 810 F.2d at 1177–78)).

## B

FERC's decision to approve rates sufficient to meet the requirements of the Syenergy loan's DSCR provision was arbitrary for another reason: by the time the Commission

---

[6] *See also id.* at 1171 (discussing testimony regarding the utility's low credit rating); *id.* at 1178 (discussing testimony on the possible drying-up of the utility's credit sources, and on its long-term inability to pay common stock dividends); *id.* at 1188 (Starr, J., concurring) (noting that the utility's "allegations of financial plight were highly detailed and specific, indicating that the utility was skating on the edge of bankruptcy").

offered that rationale, the Syenergy loan had been fully repaid. Indeed, the loan was repaid in November 1999 when Midcoast Energy Resources, Inc. acquired KPC — a full two years before FERC relied on the DSCR provision as a rationale for its November 2001 Remand Order. *See* 2002 Rehearing Order, 98 F.E.R.C. at 62,458; *see also Enbridge Pipelines*, 100 F.E.R.C. ¶ 61,260, at 61,930, 61,961 (2002).[7] Nonetheless, FERC argued that "whenever the Commission sets initial rates there is always a possibility that the nature of a loan arrangement or other financial circumstances might change before initial rates are superceded by Section 4 rates." 2002 Rehearing Order, 98 F.E.R.C. at 62,458. Accordingly, the Commission concluded, it was appropriate for it to rely on remand upon "the record that the Commission had at the time it issued its underlying . . . 1998 Order," at which time "Kansas Pipeline was still subject to the Syenergy loan." *Id.*

FERC's argument might be persuasive if Missouri PSC's charge were that unanticipated financial changes had undercut FERC's previous rationale — although even then FERC would have had to articulate a nonarbitrary reason for ignoring those new facts.[8] Missouri's complaint, however, was not that new facts had undercut an old rationale, but that FERC had adopted a new rationale premised on old facts that were no longer true. The need to satisfy the Synergy loan's DSCR provision was not a rationale for the 1998 and 1999 orders that approved KPC's existing rates. Insofar as those orders discussed concern over KPC's financial integrity at all, they did so only as a "passing reference," *Missouri I*, 234 F.3d at 41, a reference that expressly did *not* rely on the DSCR provision, *see* 1998 Order, 83 F.E.R.C. at 61,507 (stating that the Commission was not relying on the DSCR provision

---

[7] Midcoast, in turn, was purchased by the intervenor, Enbridge, on May 11, 2001. *See Enbridge Pipelines*, 100 F.E.R.C. at 61,930.

[8] *See* 18 C.F.R. § 385.716 (allowing FERC to reopen the record if "warranted by any changes in conditions of fact or of law or by the public interest"); *see also Eastern Carolinas Broad. Co. v. FCC*, 762 F.2d 95, 103 (D.C. Cir. 1985) (stating that agency decisions not to reopen the record are normally reviewed for abuse of discretion).

because FERC's approval of the existing rates rendered that issue "effectively moot"). The first time FERC relied on the DSCR provision was in the post-*Missouri I* order that it issued in November 2001. Thus, at the time FERC first announced that the existing rates were necessary to prevent both a default on the DSCR provision and the financial disaster that might follow, the Commission knew full well that there was *no* possibility that either event could occur. Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking. Requiring Missouri consumers to pay rates sufficient to prevent foreclosure on a loan that no longer exists is at least equally so.[9]

## IV

FERC's orders offered a second, two-part rationale for approving KPC's rates: they "were in the public interest and not exploitative of KPC's shippers because those rates had been [1] negotiated by those shippers, and [2] approved by the prior regulatory regime." Respondent's Br. at 34. We reject these grounds as arbitrary and capricious as well.

The fact that the existing rates had been negotiated by the pipeline's shippers is insufficient to support FERC's orders for two reasons. First, although FERC is correct that we have "required the Commission to give weight to the contracts and settlements of the parties before it," *Missouri I*, 234 F.3d at 120 (quoting *Tejas Power Corp. v. FERC*, 908 F.2d 998, 1003 (D.C. Cir. 1990)), we have also made clear that "[e]ven when customer support is unanimous, ... FERC retains the responsibility of making an 'independent judgment,'" *Laclede Gas Co. v. FERC*, 997 F.2d 936, 946 (D.C. Cir. 1993) (quoting *Tejas Power*, 908 F.2d at 1003). As we

---

[9] At oral argument, counsel for the Commission suggested that, even though the Syenergy loan had been paid off before the 2001 Remand Order, other costs might have increased in the interim. But the Commission did not point to any evidence of such increased costs, and counsel's speculation cannot salvage FERC's decision.

said in *Tejas Power*, this means that before relying on existing contracts between a pipeline and its customers to show that rates are reasonable, FERC must "first determin[e], upon the basis of substantial evidence, that the pipeline lacks significant market power." 908 F.2d at 1004. And it also means that before relying on contracts between a pipeline and its wholesale customers, FERC must "address the question of whether" the interests of those customers "are sufficiently likely to be congruent with those of ultimate consumers," *id.* at 1004, "who, presumably, will bear the cost" of the agreed-upon rates in their monthly energy bills, *id.* at 1003. *See Atlantic Refining*, 360 U.S. at 390. The orders under review in this case do not consider these relevant factors and are therefore arbitrary and capricious. *See Northern Mun. Distribs. Group v. FERC*, 165 F.3d 935, 941 (D.C. Cir. 1999).

Second, there is a serious problem with the factual premise that the existing rates were those to which the shippers had agreed. The contract of one of KPC's principal shippers, Missouri Gas Energy (MGE), makes clear that although that shipper agreed to live with the contractual rates, it was willing to do so only until FERC exercised jurisdiction in a § 7 order. According to the contingency provision of MGE's Riverside I contract, the contract rates were to be " 'adjusted upwards or downwards, as may be the case, by the difference, if any, between the rate [initially agreed to by the parties] and the rate approved by such [Commission] order.' " Initial Comments of MGE, at 10 (Nov. 26, 1997) (J.A. at 787) (quoting contract). If FERC wishes to rely upon the rates for which the parties bargained, it must consider their entire bargain.[10]

---

[10] Missouri PSC does not argue, as FERC charges, that "a contingency provision in a customer contract ... could limit FERC's discretion in setting initial § 7 rates." Respondent's Br. at 18. Rather, it argues that if FERC wants to rely on an existing contract to establish the reasonableness of a rate, it may not ignore a contingency provision of the same contract. We agree.

Finally, the Commission's decision is not rescued by the fact that the rates FERC adopted had been approved by the Kansas Corporation Commission (KCC) under the regulatory regime that governed the pipeline prior to FERC's assertion of jurisdiction. Again, we do not disagree that "this Court has directed that FERC consider the role of state regulators in protecting the ultimate consumer." Respondent's Br. at 35 (citing *Tejas Power*, 908 F.2d at 1004). But the Commission must nonetheless determine "in its *independent* judgment," whether the terms approved by the KCC meet the public convenience and necessity. *Tejas Power*, 908 F.2d at 1003 (emphasis added).

When FERC relies upon a state agency's prior approval to support the conclusion that rates are in the public interest, the Commission must at least say something about the prior regulator's rationale for approving those rates. In this case, FERC said nothing. And to the extent that we know anything about the KCC's views, what we know is not helpful to the Commission. First, although we know that the KCC approved the Syenergy loan, FERC's 1998 Order expressly rejected Kansas Pipeline's argument that such approval justified FERC approval as well:

> Kansas Pipeline argues that the Commission must approve rates which are sufficient to cover the debt service [on the Syenergy loan], since these cost and debt instruments were approved by the KCC. The Commission is not persuaded by the applicant's arguments.... While the KCC accounting order states that portions of the funds would be used to upgrade pipeline assets, ... we can find nothing in the record to account for how the $91 million was actually used.

1998 Order, 83 F.E.R.C. at 61,506–07. Second, we also know that in the request for rehearing below, the KCC joined Missouri PSC in arguing *against* approval of the existing rates, insisting that FERC "should not have relied on [the] DSCR loan provision in approving initial rates in this case in light of the facts that there was no nexus between the amount of the loan and the cost of the Kansas Pipeline facilities, and

that Kansas Pipeline had not adequately accounted for the loan proceeds." 2002 Rehearing Order, 98 F.E.R.C. at 62,458.

In sum, FERC may not brandish a state's prior approval of a set of existing rates as if it were independently sufficient to satisfy the Commission's own regulatory obligations. Section 7 imposes a duty on FERC to determine for itself whether the rates it approves are in the public interest. The Commission has not complied with that responsibility.

V

For the foregoing reasons, we conclude that the challenged FERC orders are arbitrary and capricious. As this is the second time that FERC has failed to justify its approval of KPC's existing rates, we vacate those orders.

Missouri Public Service has requested that we also "direct the Commission to refund, with interest, the difference between properly calculated initial rates and the [approved] rates," from December 2, 1997, through the date the NGA § 4 rates went into effect. Petitioner's Br. at 58. At oral argument, FERC counsel did not dispute that the Commission would have authority to require such a refund if we vacated its orders. *See also United Gas Improvement Co. v. Callery Props.*, 382 U.S. 223, 229–30 (1965); *Public Serv. Comm'n v. Federal Power Comm'n*, 329 F.2d 242, 250 (D.C. Cir. 1964). Although we do not see any reason why a refund would not be in order at this point, the Commission has not yet addressed the question. And we could not, in any event, calculate the appropriate amount of a refund on our own. Accordingly we vacate FERC's 2001 Remand Order and 2002 Rehearing Order, and remand with directions that the Commission address the question of an appropriate refund.

*So ordered.*